Kathy **LEFLER**, Ray **Judd**, Michael **Tuft**, Matthew **Swainston** and the class of similarly situated persons, Plaintiffs,

v.

**UNITED HEALTHCARE OF UTAH, INC.,** a Utah corporation, formerly known as Physicians Health Plan of Utah, Defendants.

No. 2:95CV–1109–S.

United States District Court, D. Utah, Central Division.

Sept. 27, 2001.

Brian S. king, Marcie Schaap, Scott Isaacson, King & Isaacson, Salt Lake City, UT, Butch Johnson, Resource Managment, Salt Lake City, UT, for plaintiffs.

Jaryl L. Rencher, Epperson & Rencher, Salt Lake City, UT, Bruce M. Pritchett, Jr., Salt Lake City, UT, Timothy E. Branson, Dorsey & Whitney, Minneapolis, MN, for defendant.

1. *See* Affidavit of Marcie E. Schaap and exhibits attached thereto.

## MEMORANDUM DECISION

SAM, Senior Judge.

Before the court are two motions: (1) a motion for summary judgment submitted by representative class plaintiffs Kathy Lefler, Ray Judd, Michael Tuft, and Matthew Swainston, and a certified class of similarly-situated persons (collectively "plaintiffs"); and (2) a motion for summary judgment submitted by defendant United HealthCare of Utah, Inc. The court, having carefully considered the parties' briefing, now issues the following ruling.

## FACTUAL BACKGROUND

The following summary of undisputed material facts has been gleaned from the parties' briefing. Defendant, an insurer and a health maintenance organization or HMO [1], provided group health insurance to employers and their employees, and occasionally employees' family members, in Utah for a number of years, including specifically the period between 1992 through 1995. Employees would often, but not always, directly contribute to the premiums for this insurance. In Utah from 1992 to 1995, most employers paid at least 50% of the premiums for employer-sponsored health plans. For some health care services provided by defendant, plaintiffs were required to pay a set percentage of the amount charged by the health care provider. This payment, known as a "co-payment", was typically 10% to 30% of the amount billed and was designed to be plaintiffs' contribution to the cost of the medical procedure.[2]

The terms of defendant's coverage for plaintiffs are set forth in their Certificates of Coverage, although the particular

2. Plaintiffs also paid a yearly deductible and, for some types of health care, a fixed sum as a co-payment, such as $5 or $10. These payments are not at issue in this case.

Schedules of Benefits, which list required percentage co-payments, vary according to the plan design selected by plaintiffs' employers. The Certificates of Coverage and Schedules of Benefits for each of the named plaintiffs were dated November 1992, and the Schedules of Benefits provided for various co-payments as a percentage (usually 10% or 20%) of "Eligible Expenses." "Eligible Expenses" are defined in the Certificates of Coverage as "Reasonable and Customary Charges for Health Services Covered under the Policy, incurred while the Policy is in effect." "Reasonable and Customary Charges", in turn, are defined in the Certificates of Coverage as:

> [F]ees for Covered Health Services and supplies, which in [defendant's] judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which do not exceed the fees that the provider would charge any other payor for the same services.

Defendant, thus, calculated plaintiffs' percentage co-payments based on "Reasonable and Customary Charges". The Certificates of Coverage also state that defendant "has sole and exclusive discretion in interpreting the benefits covered under the Plan and the other terms, conditions, limitations and exclusions set out in the Policy and in making factual determinations relating to the Policy and its benefits."

Defendant established a network of "preferred" or "participating" medical providers from which plaintiffs were obligated to obtain medical services to receive coverage by defendant.[3] Defendant entered into contracts with its providers which determined the amount the providers would receive for particular services. Providers were prohibited from collecting any amounts from plaintiffs or defendant which exceeded the providers' contractual amount. The provider contracts generally, but not always, resulted in providers receiving less than their full charges in reimbursement.[4] These providers were included in defendant's network, and defendant would direct its members to them.

Defendant calculated plaintiffs' co-payments as a percentage of the provider's full billed charges and not as a percentage of its usually lower contracted rates with the provider. Thus, plaintiffs argue they ultimately paid a higher co-payment percentage of the cost of their medical care than the co-payment percentage they believed they were paying based upon language in their health plans. Defendant claims its co-payment percentage calculations were well-known and routinely explained during insurance agent presentations and enrollment meetings. Defendant also contends some of its members received bills directly from providers which explained defendant's co-payment calculation methodology. None of the representative plaintiffs, however, were aware of defendant's co-payment calculation practice.

Neither the Certificates of Coverage nor the Schedules of Benefits disclose how much defendant will pay to a provider for covered services or that plaintiffs' percentage co-payments were based on the provider's billed charges and not the provider's contracted rates. The Explanations of

---

3. Defendant also insured plaintiffs for out-of-network emergency health services and certain other approved out-of-network care.

4. An example Physician Participation Agreement indicates that defendant paid the provider the lesser of the provider's full billed charges or the amount defendant negotiated with the provider.

Benefits ("EOBs"), sent to plaintiffs after they had obtained medical services, list the medical provider, the "billed charges", the co-payment amount plaintiffs were required to pay, and indicate that the provider received a "contracted fee" but do not provide the "contracted fee" amount. The EOBs do not define "billed charges" or "contracted fee", disclose the amount defendant paid to its providers, the total amount received and accepted by the provider as payment in full for the health care services, or the percentage of the provider's contractual amount which the class members ultimately paid. It was not uncommon for plaintiffs' co-payments to be equal to or greater than the provider's negotiated rates. In these circumstances, and unbeknownst to plaintiffs, a plaintiff's "co-payment" was the *only* amount the provider received as full payment for the medical service.

Medicare based its co-payments for outpatient hospital services as a percentage of the amount billed by the provider. Medicare, however, reimbursed hospitals based on providers' reasonable costs, which meant that a patient's 20% co-payment, while equaling 20% of a hospital's charges for a service, usually exceeded 20% of the amount the hospital ultimately received in payment.

Defendant's practice of calculating percentage co-payments based on its providers' billed charges was also consistent with the practice approved by the Minnesota Department of Health. Defendant's parent company is located in Minnesota. In 1992, the Minnesota Department of Health amended its rule to limit co-payments to 25% of the "provider's charge", which, in language similar to that found in defendant's Certificate of Coverage, it defined to mean "the fees charged by the provider which do not exceed the fees that the provider would charge any other person ..." The Minnesota Department of Health and the Administrative Law Judge that approved the rule also clarified that the provider's "charge" was not the same thing as the amount paid to the provider, and that it was reasonable and proper for an HMO to calculate percentage co-payments based on charges, while paying providers based on contracted rates.

The parties' cross-motions for summary judgment, thus, flow from plaintiffs' allegation that defendant's method of calculating co-payments as a percentage of the provider's full billed charges was not explained to them in a straightforward manner in the Certificates of Coverage, the Schedules of Benefits, or the EOBs defendant sent to plaintiffs at the time their claims were processed and paid. Discovery has revealed that the certified class may consist of over 12,000 individuals with claims averaging between $100 and $200. The issues before the court concern whether defendant's co-payment calculation method violated the terms of its insurance policy, provisions of the Utan Insurance Code, and various provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq.

## SUMMARY JUDGMENT STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only when the pleadings, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[5] *See e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden has two distinct

---

**5.** Whether a fact is material is determined by looking to relevant substantive law. *Anderson* *v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

components: an initial burden of production on the moving party, which burden when satisfied shifts to the nonmoving party, and an ultimate burden of persuasion, which always remains on the moving party. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727 (2d ed.1983).

When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for his motion and identifying those portions of the record and affidavits, if any, he believes demonstrate the absence of a genuine issue of material fact. *See* Celotex, 477 U.S. at 323, 106 S.Ct. 2548. In a case where a party moves for summary judgment on an issue on which he would not bear the burden of persuasion at trial, his initial burden of production may be satisfied by showing the court there is an absence of evidence in the record to support the nonmovant's case.[6] *See id.* "[T]here can be no issue as to any material fact ... [when] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a gen-uine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

> If the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ....

*Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law. *See id.*

---

**6.** In his dissent in *Celotex*, Justice Brennan discussed the mechanics for discharging the initial burden of production when the moving party seeks summary judgment on the ground the nonmoving party-who will bear the burden of persuasion at trial-has no evidence:

> Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

*Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (citations omitted).

## STANDARDS OF REVIEW

In addition to the standards for evaluating the parties' cross-motions for summary judgment, this court must also address the standards of review appropriate for ERISA claims under 29 U.S.C. § 1132(a)(1)(B) which guide its consideration of defendant's interpretation of its health plan.

In *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the United States Supreme Court noted that an action based upon Section 1132(a)(1)(B) permits plaintiffs to seek "to recover benefits due under the plan, to enforce rights under the terms of the plan, and to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract." *Id.* at 108, 109 S.Ct. 948. Because ERISA does not set forth a judicial standard of review for Section 1132(a)(1)(B) suits, however, the court concluded as follows: "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard *unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948 (emphasis added). "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Id. (citation omitted). In this case, it is undisputed that the Certificates of Coverage grant defendant "sole and exclusive discretion" to interpret the insurance plans and make factual determinations regarding benefits.[7]

The Tenth Circuit Court of Appeals has determined that, under *Firestone,* when an insurer has such discretionary authority, a court must uphold the insurer's decision "unless it was arbitrary and capricious." *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir. 1996). The *Chambers* court, thus, recognized that "[s]ince *Firestone,* all of the circuit courts agree that a conflict of interest triggers a less deferential standard of review." *Id.* If a fiduciary has a conflict of interest, Tenth Circuit law requires the court to apply a "sliding scale" approach. *See id.* at 826–27. Under this procedure, the court applies an arbitrary and capricious standard but decreases the deference given to the fiduciary's decision "in proportion to the seriousness of the conflict." *Id.* at 825. The level of deference, therefore, " 'will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.' " *Id.* at 826 (citation omitted). The Tenth Circuit has concluded this "sliding scale" approach "more closely adheres to the Supreme Court's instruction to treat a conflict of interest as a 'facto[r] in determining whether there is an abuse of discretion.' " *Id.* (citation omitted). The appellate court has stated that " 'the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged.' " *Id.* at 827 (citation omitted).

Before considering the impact of a conflict of interest upon the arbitrary and capricious standard, however, the court must first determine whether a conflict of interest indeed exists. In *Jones v. The*

---

7. A "fiduciary" is defined in 29 U.S.C. § 1002(21)(A) as one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... [or] has any discretionary authority or discretion-
ary responsibility in the administration of such plan." Defendant is a fiduciary. *See Misch v. Community Mut. Ins. Co.,* 896 F.Supp. 734, 739 (S.D.Ohio 1994). The parties agree, however, that defendant is not the plan administrator.

*Kodak Medical Assistance Plan,* 169 F.3d 1287 (10th Cir.1999), the Tenth Circuit set forth a number of example factors for courts to consider in deciding whether a conflict of interest exists.[8] These factors, however, focus on conflicts of interest which may arise in the context of self-funded plans and are not applied effectively in this case where the plan is not self-funded, and defendant is the insurer.

In *Pitman v. Blue Cross and Blue Shield of Oklahoma,* 217 F.3d 1291 (10th Cir.2000), the defendant, acting as both insurer and plan administrator, denied the plaintiff his requested coverage. In determining whether the defendant had a conflict of interest, the Tenth Circuit listed the *Jones* factors but, acknowledging that the plan at issue was not self-funded, stated: " '[W]hen an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants'." *Id.* at 1296 (quotation omitted). The court also noted that the defendant insurer "has a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry." *Id.* Additionally, the court recognized that the defendant's "corporate officers have incentives to maintain an economically healthy and successful company in order to ensure the viability and competitiveness of the company for the sake of their own job stability." *Id.* The court, thus, found that because the defendant

insurer "is in the business of insurance[,] . . . it can only remain economically viable through its insurance transactions." *Id.* n. 4. Accordingly, "as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound." *Id.* (emphasis added). As a result, the court applied a lower level of deference to the defendant's interpretation of its health plan. *See also McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1259 (10th Cir.1998) ("because every exercise of discretion impacts [the insurer] financially, filling or depleting its coffers, we afford its decisions less deference depending on the degree of conflict manifest").

■ In the instant case, defendant argues that, because little if any conflict of interest exists, the court's full deference to its determinations is warranted. Defendant contends it has no motivation to deny benefits to increase its profits because its premiums are experience-rated[9], and it receives no actual financial benefit from the manner in which it calculates its co-payment percentages because its method results in lower premiums for employers and those employees who may contribute to the premiums. In *Pitman,* defendant Blue Cross and Blue Shield pointed to the fact that, as a *non-profit* corporation, it had no motivation to deny claims to increase its profits, and it decreased its premiums or increased its benefits when its income allowed. The Tenth Circuit, however, rejected its arguments, concluding Blue Cross, an entity "in the business of

---

**8.** These factors include whether: "(1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan." *Jones,* 169 F.3d at 1291.

**9.** *See, e.g., Metropolitan Life Ins. Co. v. Potter,* 992 F.Supp. 717, 730 (D.N.J.1998) (insurer's "profit-making objective" as a conflict of interest "may arguably be ameliorated where . . . the plan is experience-rated"). The court, however, determined it did not need to reach the conflict of interest issue.

insurance", could not overcome its inevitable interests in remaining financially sound and competitive. *See Pitman*, 217 F.3d at 1296. This court, likewise, finds defendant's arguments similarly unavailing. The manner in which defendant calculates its percentage co-payments generally reduces the amounts it must pay to its providers while increasing plaintiffs' co-payment obligations. Although not the plan administrator in the instant case, defendant is in the "business of insurance" and cannot overlook its financial interests.

Also, as plaintiffs argue, defendant cannot minimize its financial conflict of interest by contending its percentage co-payment calculation practices resulted in reduced premiums which actually benefitted individual employees. Although some employees contributed to the insurance premiums, employers sometimes paid all or a greater percentage of these purportedly-lower insurance premiums, thus receiving all or a greater portion of the benefit.[10] Of course, lower premiums also make defendant more competitive in the insurance industry. *See Pitman*, 217 F.3d at 1296; *McConocha*, 930 F.Supp. at 1185. Moreover, because this case concerns the manner in which defendant's percentage co-payments are calculated routinely, defendant's practice affects not one or two plaintiffs seeking specific benefits but potentially thousands

of participants or beneficiaries who made percentage co-payments toward their health care, creating a significant economic impact upon defendant.

"A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms." *McGraw*, 137 F.3d at 1259.

When reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious." ... The decision will be upheld unless it is "not grounded on *any* reasonable basis." ... The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end."

*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999) (citations omitted) (emphasis in original).

The court, thus, concludes that, for plaintiffs' claims based upon Section 1132(a)(1)(B), it must determine whether defendant's interpretation of its plan terms is arbitrary and capricious, giving less deference to such interpretation in proportion to the seriousness of its conflict of interest.[11]

---

10. *See* Affidavit of Robin S. Bassani, ¶ 12; Affidavit of David Sorenson, ¶ 3; Affidavit of Donald E. Sparks, ¶ 7; *see also McConocha v. Blue Cross and Blue Shield Mut. Of Ohio*, 930 F.Supp. 1182, 1185 (N.D.Ohio 1996) ("where the employer, rather than the individual, pays the premium, the individual derives no direct benefit from any reduction in that expense"). For example, in plaintiff Kathy Lefler's case, the employee contributed 50% of the insurance premiums, while in plaintiff Matthew S. Swainston's case, the employee contributed nothing toward the premiums.

11. Under the Tenth Circuit's "sliding scale" approach:

[W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, [the court] will not act as deferentially as would otherwise be appropriate. Rather, [it] will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

■ In *Firestone*, the Supreme Court limited its analysis to " 'the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations' ... [and] express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." *Firestone*, 489 U.S. at 108, 109 S.Ct. 948. In addition to their claims under Section 1132(a)(1)(B), plaintiffs allege defendant violated the Utah Insurance Code and other ERISA provisions, including 29 U.S.C. §§ 1022, 1104, and 1133, for which they seek relief under 29 U.S.C. § 1132(a)(3). Because plaintiffs' allegations under these state and federal statutes implicate defendant's fiduciary responsibilities, a *de novo* standard of review is proper. *See Firestone*, 489 U.S. at 111–12, 109 S.Ct. 948; *Moench v. Robertson*, 62 F.3d 553, 564–65 (3rd Cir.1995), *cert. denied*, 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996).

## DISCUSSION

### I. *Plaintiffs' Section 1132(a)(1)(B) Claims*

Plaintiffs contend defendant's failure to pass through to them the financial benefits defendant secured through its negotiated agreements with its providers violated the terms of its insurance plan and, thus, violated 29 U.S.C. § 1132(a)(1)(B) of ERISA.

■ The Tenth Circuit has instructed that " 'the objective in construing a health care agreement, as with general contract terms, is to ascertain and carry out the true intention of the parties.' " *Pitman*, 217 F.3d at 1298 (citation omitted). In so doing, the court must give the plan language " 'its common and ordinary meaning *as a reasonable person in the position of the [plan] participant,* not the actual participant, would have understood the words to mean.' " (citation omitted) (emphasis in original).

■ To resolve plaintiff's claim, the court turns to the plain language of defendant's health plan. In the Schedules of Benefits, percentage co-payments are listed as various percentages (generally 10% or 20%) of "Eligible Expenses." The Schedules provide no definition of "Eligible Expenses" or state that they are equivalent to a provider's full billed charges, nor do they further explain how co-payments are calculated.

In the Certificates of Coverage, "Eligible Expenses" are defined as: "Reasonable and Customary Charges for Health Services Covered under the Policy, incurred while the Policy is in effect." The Certificates of Coverage then define "Reasonable and Customary Charges" as:

> fees for Covered Health Services and supplies which, in PLAN's judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which do not exceed the fees that the provider would charge any other payor for the same services.

The Certificates do not explain how percentage co-payments are calculated.

The Explanations of Benefits (EOBs) defendant mailed to plaintiffs after they obtained medical services contained the following information, in column format: Provider, Date, Billed Charges, and Copay Amount. "Billed Charges" are not de-

*Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 86 (4th Cir.1993). "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict.... 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 154 (4th Cir.1996); *accord McGraw,* 137 F.3d at 1263.

fined, but they are the provider's full, non-negotiated amounts. The Copay Amount is equivalent to the relevant percentage, i.e., 10% or 20%, of the amount under "Billed Charges." The EOBs note that payment has been made to the provider for a "Contracted Fee", but "Contracted Fee" is not defined or otherwise explained.[12]

Plaintiffs interpret the language of the policy as meaning that their percentage co-payments are based upon the provider's negotiated rates. The court does not find plaintiffs' interpretation unreasonable. Individuals obtain insurance or become HMO members presumably to receive financial benefits and savings the insurer provides on their behalf, and ERISA requires the insurer to act with "undivided loyalty" to plan participants.[13] A reasonable person viewing the Schedules of Benefits could conclude that, because a participant's co-payment was 10% or 20% of the "Eligible Expenses", defendant would contribute the remaining percentage. Moreover, giving the terms their common and ordinary meanings, as would a reasonable person viewing the plan documents, the words "eligible" and "reasonable" could be qualifying terms, indicating that some criteria have been applied. Under defendant's interpretation, a provider's full, non-negotiated amount would always be accepted as "eligible" and "reasonable". A person of ordinary understanding could construe the

plan's definition of "Reasonable and Customary Charges" as indicating that some judgment and negotiation has taken place between defendant and its providers. Indeed, the definition explicitly states defendant has exercised "judgment" as it has considered what fees are "representative" of "average and prevailing" charges within "the same or similar geographic communities".[14] Under defendant's interpretation, however, whatever amount a provider decides unilaterally is a full charge is the market rate and would always be "judged" as "representative of the average and prevailing charge" within "the same or similar geographic communities".[15]

■ Finally, the last phrase of the plan's definition of "Reasonable and Customary Charges" states plaintiffs' co-payments are not based upon fees that "exceed the fees that the provider would charge any other payor for the same services". However, plaintiffs argue that is precisely what occurred in this case. Plaintiffs paid co-payments based not on lower rates charged by providers in the same area, i.e., their negotiated rates, but on higher rates, i.e., the provider's full, non-negotiated rates. Thus, plaintiffs contend defendant based their percentage co-payments on fees which *did* exceed the amounts the provider was charging defendant, i.e., another payor. This interpretation and practice, according to plaintiffs,

---

**12.** The Group Policy, an example of which has been included among the exhibits in the briefing, does not define co-payments or explain how they are calculated.

**13.** *See, e.g., McConocha,* 930 F.Supp. at 1186 (where plan documents fail to explain insurer's "discount scheme", plaintiffs cannot "be deemed to have intended that such a scheme would be a part of their contract").

**14.** *See, e.g., Corsini v. United Healthcare Servs., Inc.,* Case No. 96-0608-T, slip op. at 15 (D.R.I. May 17, 2001) ("Unlike the

'charged' amounts that are unilaterally determined by the providers, the 'contract fees' are negotiated, at arms [sic] length, and, therefore, presumably are within the range of what could be considered the market value of the services.").

**15.** *See, e.g., Corsini,* slip op. at 11–12 ("[T]he amounts 'charged' are amounts that the providers, unilaterally, decided that their services were worth rather than amounts that the marketplace determined to be reasonable and customary for those services.").

directly contradict the plain language of the plan. Plaintiffs contend that if, as defendant states, its percentage calculation method is widely-known and explained routinely by insurance agents in presentations and enrollment meetings,[16] there is no reason why the plan language [17] should not conform clearly to defendant's practice.

Defendant's interpretation of its plan language is that "Eligible Expenses" and "Reasonable Customary Charges" are synonyms for the provider's full, non-negotiated amounts. It claims, therefore, that plaintiffs' percentage co-payments are based on the provider's full non-negotiated amount, which constitutes market value. Under defendant's interpretation, plaintiffs' percentage co-payments will *always* be based on the provider's full amounts regardless of whether defendant's contribution to the medical bills is based on a lesser amount, due to its undisclosed negotiated contracts with its providers. Defendant, thus, generally, but not always, obtains a financial benefit that plaintiffs are never informed about and never receive.

Defendant interprets the last phrase of the plan's definition of "Reasonable and Customary Charges" differently than do plaintiffs. Defendant points to the unre- butted affidavits of William O. Cleverley and Terry Cameron and the testimony of plaintiffs' expert witness, Mary Covington, which indicate that providers have one set charge for each kind of medical service which they submit to various payors on an industry-standard claim form, approved by the Health Care Financing Administration. Although this charge is the same for every payor, defendant argues, the provider may accept different amounts as payments in full from different payors, depending upon its negotiated contracts. Defendant, thus, claims that, because providers' full charges for a given service are always equivalent, through basing plaintiffs' co-payment percentage consistently upon these charges, it has ensured that the co-payments are not based on an amount which exceeds the amount the provider would charge "*any* other payor". Defendant also notes its co-payment calculation method was followed consistently, even when providers' full charges were less than their negotiated contractual rates.[18] This consistent interpretation, defendant argues, resulted in lower premiums for both employers and contributing employees.[19] Plaintiffs assert defendant's reading of the last phrase renders it superfluous. Defendant's interpretation, however, harmonizes reasonably with "*any*

16. *See* unrebutted affidavits of Susan Zollinger, Steven D. Shields, Charles H. Cowley, and Donald E. Sparks.

17. The EOBs reasonably perpetuate the belief that defendant is paying the remaining portion of the amount listed and do not inform the recipient of the amount the provider is accepting as full payment or the amount of defendant's contribution. Thus, they do not inform the recipient that the co-payment amount may actually be a greater percentage of the medical bill than that indicated. Regardless of the language in the EOBs, however, the Tenth Circuit has recognized that ERISA does not encompass oral or "informal written changes" as part of an employee benefit plan. *See Miller v. Coastal Corp.,* 978

F.2d 622, 624–25 (10th Cir.1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993). In that case, the district court concluded "the written benefit statements were not formal plan documents." 978 F.2d at 624.

18. Plaintiffs claim their percentage co-payments were *always* higher than they should have been because providers were *always* obligated to accept defendant's lower contractual rates. The example Physician Participation Agreement, however, illustrates that providers agreed to accept the *lesser* of their full charges or their contractual rates.

19. *See* unrebutted affidavits of Susan Zollinger and Steven D. Shields.

other payor" while plaintiffs' interpretation speaks only to defendant as a payor. Moreover, the last phrase, of course, must be tied to the preceding phrase. Defendant contends it has performed according to its interpretation of the last phrase. Plaintiffs' interpretation makes it impossible for defendant to perform, requiring defendant to obtain confidential information regarding its providers' contracts with other insurance companies, the "other payors".

Defendant has also submitted unrebutted evidence supporting its interpretation as reasonable. For example, Medicare based its co-payments for outpatient hospital services as a percentage of the amount billed by the provider. The provider's charges are statutorily-defined, in language comparable to that in the policies at issue, as "*reasonable* charges for such items and services (not in excess of [20%] of the amount *customarily* charged for such items and services by such provider)". 42 U.S.C. § 1395cc(a)(2)(A)(ii) (emphasis added). Medicare, however, reimbursed hospitals based on providers' reasonable costs, which meant that a patient's 20% co-payment, while equaling 20% of a hospital's charges for a service, usually exceeded 20% of the amount the hospital ultimately received in payment. *See* 42 U.S.C. § 13951(a)(2)(B)(i); Affidavit of William O. Cleverley.

Moreover, defendant's practice of calculating percentage co-payments based on its providers' billed charges was also consistent with the practice approved by the Minnesota Department of Health. Defendant's parent company is located in Minnesota. In 1992, the Minnesota Department of Health amended its rule to limit co-payments to 25% of the "provider's charge", which, in language similar to that found in defendant's Certificate of Coverage, it defined to mean "the fees charged by the provider which do not exceed the fees that the provider would charge any other person ..." The Minnesota Department of Health and the Administrative Law Judge that approved the rule also clarified that the provider's "charge" was not the same thing as the amount paid to the provider, and that it was reasonable and proper for an HMO to calculate percentage co-payments based on charges, while paying providers based on contracted rates. *See also Garofalo v. Empire Blue Cross and Blue Shield*, 67 F.Supp.2d 343, 346 (S.D.N.Y.1999) (recognizing that, under New York law, a participant's co-payment can be based on a hospital's actual charges while defendant's contribution is based on a percentage of a "statistical average rate for the hospital costs of the procedure at issue").

Having considered the plain language of the policy, the parties' interpretations of that language, and defendant's other evidence supporting its view as reasonable, the court finds the policy language susceptible to two different interpretations and, thus, ambiguous.[20]

■ Plaintiffs argue that, in the event the court finds the policy language ambiguous, the court should resolve such ambiguity by applying the doctrine of *contra proferentem* and construing the language in plaintiffs' favor. In *Kimber v. Thiokol Corp.*, 196 F.3d 1092 (10th Cir.1999), how-

---

**20.** *See, e.g., Hoover v. Blue Cross and Blue Shield of Alabama*, 855 F.2d 1538, 1542–43 (11th Cir.1988) (defendant's interpretation of policy language "20% of the hospital's charges" as meaning hospital's full billed charges "is at least reasonable", particularly when supported by unrebutted evidence); *Everson v. Blue Cross and Blue Shield of Ohio*, 898 F.Supp. 532, 537 (N.D.Ohio 1994)(policy language defining "provider's reasonable charge" as "the charge that we determine is reasonable for Covered Services provided to you. A Contracting Provider's Reasonable Charge is *established by the agreement between us and the provider*", read alone, is ambiguous).

ever, the Tenth Circuit rejected that doctrine, holding that "when a plan administrator has discretion to interpret the plan and the standard of review is arbitrary and capricious, the doctrine of contra proferentem is inapplicable." *Id.* at 1100. The court explicitly adopted the view of the Seventh Circuit in *Morton v. Smith*, 91 F.3d 867 (7th Cir.1996):

> Courts invoke [contra proferentem] when they have the authority to construe the terms of a plan, but this authority arises only when the administrators of the plan lack the discretion to construe it themselves. Therefore, it is only used when courts undertake a de novo review of plan interpretations. When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of contra proferentem. Deferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry—the construction of someone else's construction. Because this case engages us in this more abstract exercise, we will not apply the rule.

*Kimber,* 196 F.3d at 1100 (quoting *Morton,* 91 F.3d at 871 n.1(citations omitted)). Plaintiffs, however, focus not on the *Morton* reasoning but on the Tenth Circuit's further statement that the Fifth Circuit's approach, "meld[ing] contra proferentem into the required discretionary review", did not conflict with its decision in *Kimber. Id.* at 1101. Plaintiffs, thus, argue the

Tenth Circuit has not prohibited the application of *contra proferentem* and urges the court to pursue its use in this case. Despite the Tenth Circuit's observations concerning the Fifth Circuit's approach, the court declines plaintiffs' invitation to apply *contra proferentem* in this case in light of the Tenth Circuit's clear preference for the Seventh Circuit's reasoning.[21]

The court has carefully reviewed the parties' interpretations of the plan language. Applying the appropriate standards of review set forth above, including the Tenth Circuit's "sliding scale" approach, the court cannot conclude defendant's interpretation of the terms of its insurance policy is unreasonable and, therefore, arbitrary and capricious. Although the court may adjust the defendant's position downward on the "sliding scale" of reasonableness in view of its conflict of interest, defendant's view must be upheld "even if on the low end." Accordingly, as to plaintiffs' Section 1132(a)(1)(B) claims, the court hereby DENIES plaintiffs' motion for summary judgment and GRANTS defendant's motion for summary judgment.

## II. *Plaintiffs' Remaining Claims*

■ Alternatively, plaintiffs allege defendant breached its fiduciary duties, thus violating ERISA provisions 29 U.S.C. §§ 1022 ("Summary plan description"), 1104 ("Fiduciary duties"), and 1133 ("Claims procedure"). Plaintiffs further contend defendant violated Utah Code Ann. § 31A–26–301.5(2)(c). Plaintiffs state: "The relief the Class seeks for violations of ERISA and Utah insurance law

---

**21.** To the extent plaintiffs contend the court should apply a state doctrine of *contra proferentem,* the court disagrees as it is not persuaded such a law survives ERISA preemption. *See, e.g., Hammond v. Fidelity & Guaranty Life Ins. Co.,* 965 F.2d 428, 430 (7th Cir. 1992)("We cannot imagine any rational basis for the proposition that state rules of contract interpretation 'regulate insurance' within the meaning of § 1144(b)(2)."); *Thibodeaux v. Continental Casualty Ins. Co.,* 138 F.3d 593, 596 (5th Cir.1998) ("We, like the other circuits that have addressed this issue, agree that ERISA preempts state law governing insurance policy interpretation.").

**1324**

falls under 29 U.S.C. § 1132(a)(3)." Memorandum in Opposition to Defendant's Motion for Summary Judgment, p. 3.

Section 1132(a)(3) provides as follows:

A civil action may be brought–

. . .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis added). In *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Supreme Court determined that Section 1132(a)(3) permitted individual claims for equitable relief for breach of fiduciary obligations. *See id.* at 512–515, 116 S.Ct. 1065. The *Varity* Court, however, cautioned:

> [T]he statute authorizes *"appropriate"* equitable relief. We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." ... Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

*Id.* at 515, 116 S.Ct. 1065 (citations omitted) (emphasis in original).

In the wake of *Varity,* federal courts have concluded that, when a plaintiff *can* state a claim for relief under 29 U.S.C. § 1132(a)(1)(B), the plaintiff cannot maintain simultaneously a claim under 29 U.S.C. § 1132(a)(3).[22]

**22.** *See, e.g., Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 610 (5th Cir.1998) (Because plaintiff "has adequate relief available for the alleged improper denial of benefits through his right to sue the Plans directly under section 1132(a)(1), relief through the application of Section 1132(a)(3) would be inappropriate.... The simple fact that Tolson did not prevail on his claim under section 1132(a)(1) does not make his alternative claim under section 1132(a)(3) viable."); *Farthing v. United HealthCare of the Midwest, Inc.,* No. 98–4262–CV–C–9–4–ECF, at 6–7 (W.D.Mo. Feb. 29, 2000) ("[I]f a plaintiff states a cognizable claim for unpaid benefits under 29 U.S.C. § 1132(a)(1)(B), then he cannot recover for breach of fiduciary duty pursuant to §§ 1109 or 1132(a)(3), regardless of whether he may ultimately succeed on the merits under § 1132(a)(1)(B)."); *Wineinger v. United Healthcare Ins. Co.,* 8:99CV141, 2000 WL 1277629, 2000 U.S. Dist. LEXIS 1849, at *10 (D.Neb. Feb. 16, 2000) ("Although plaintiff argues that she is seeking damages in Count II for the defendant's alleged deception rather than for excess co-payments ... she in fact seeks to enforce her right under the terms of the plan to have co-payments based on openly negotiated discount agreements between the defendant and health care providers. These damages are compensatory and hence are not recoverable under section [1132](a)(3)."); *Kennedy v. United Healthcare of Ohio, Inc.,* 186 F.R.D. 364, 368 (S.D.Ohio 1999) ("Plaintiffs can and have pursued relief to recover benefits allegedly due under the terms of the plan and to enforce their rights under the plan pursuant to § 1132(a)(1)(B). Thus, because Plaintiffs *can avail themselves* of other remedies afforded by § 1132, under *Varity,* they cannot also maintain breach of fiduciary duty claims under § 1132(a)(3).") (emphasis added); *Donner v. United HealthCare Corp.,* No. 97–1052–C–M/S, at 20 (S.D. Ind. Dec. 18, 1997 and Aug. 18, 1999) ("If a plaintiff can *gain* relief for his or her injury under § 1132(a)(1)(B), regardless of whether such an action was *plead,* that plaintiff will not be in need of 'appropriate' equitable relief under § 1132(a)(3).") (emphasis added); *Sinclair v. United HealthCare of Georgia,* 1:96–CV–3412–GET 1997 U.S.Dist. LEXIS 23696, at *6 (N.D.Ga. May 5, 1997) ("[P]laintiffs may not rely on Varity to bring a claim for breach of fiduciary duty because an adequate remedy is provided pursuant to section 1132(a)(1)(B).").

The court, likewise, concludes that, because plaintiffs had the right to pursue their viable claim under Section 1132(a)(1)(B), regardless of the outcome, plaintiffs may not maintain their claims for breach of fiduciary duties under Section 1132(a)(3). Accordingly, as to these claims, the court hereby DENIES plaintiffs' motion for summary judgment and GRANTS defendant's motion for summary judgment.

## CONCLUSION

In sum, the court concludes defendant's practice of calculating percentage co-payments from a provider's billed charges, and not from the provider's agreed contractual amount, is based upon, at least, a reasonable interpretation of the plan language and is, therefore, not arbitrary and capricious. Moreover, because plaintiffs had a viable claim under ERISA, 29 U.S.C. § 1132(a)(1)(B), they are not eligible, as a matter of law, for other "appropriate equitable relief" pursuant to 29 U.S.C. § 1132(a)(3). They may not, therefore, maintain their claims for breach of fiduciary duties.

Accordingly, the court hereby DENIES plaintiffs' motion for summary judgment on their theory of liability and GRANTS defendant's motion for summary judgment.

*But see In re Blue Cross of Western Pennsylvania Litigation,* 942 F.Supp. 1061, (W.D.Pa. 1996) (plaintiffs could maintain claims under both Sections 1132(a)(1)(B) and 1132(a)(3)).