**SEALY, INC., as Plan Administrator for the Sealy, Inc. PPO Plan, Plaintiff,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, State Farm Mutual Automobile Insurance Company, Allison Barman, Bruce Barman, Defendants.**

No. 1:02 CV 217.

United States District Court, M.D. North Carolina.

Sept. 29, 2003.

Debbie Weston Harden, Katherine T. Lange, Bradley Clayton Morris, Womble Carlyle Sandridge & Rice, PLLC, Charlotte, NC, for Sealy, Inc.

John M. Deangelis, Jim W. Phillips, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, Stephen C. Gray, Nelson M. Reid, Bricker & Eckler, Columbus, OH, for Nationwide Mut. Ins. Co.

Torin Lane Fury, Frazier & Frazier, L.L.P., Greensboro, NC, James Scott Lewis, Patterson Dilthey Clay Bryson & Anderson, LLP, Wilmington, NC, for State Farm Mut. Auto. Ins. Co.

Walter K. Burton, Stephanie W. Anderson, Burton & Sue, L.L.P., Greensboro, NC, for Allison Barman, Bruce Barman.

## MEMORANDUM OPINION

OSTEEN, District Judge.

The court's role in this insurance coverage dispute is to determine the appropriate claimant of the fund at issue. Plaintiff Sealy, Inc. ("Sealy"), a plan sponsor, administrator and fiduciary of an Employee Retirement Income Security Act ("ERISA") qualified employee medical benefit plan, brought this action seeking a declaration of its rights pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, equitable relief by restitution through imposition of a constructive trust or equitable lien, and enforcement of its subrogation rights under the plan. This matter is currently before the court on cross motions for summary judgment by Defendants Allison and Bruce Barman[1] ("Barmans") and Plaintiff Sealy.[2] This action arises under ERISA, 29 U.S.C. § 1001, *et seq.*, and presents a federal question pursuant to 28 U.S.C. § 1331. After reviewing the briefs, affidavits and other supporting materials, the court will deny the Barmans' motion for summary judgment and will grant Sealy's motion for summary judgment.

## I. BACKGROUND

The material facts of this case are both tragic and undisputed. In September 1999, Defendant Allison Barman, then seventeen years old, was seriously injured when the driver of the car in which she was a passenger caused an accident. A resulting brain injury left her with permanent physical and mental disabilities including extensive brain damage, short and long-term memory loss, substantial reduction in IQ, paralysis of the right hand, extreme difficulty in using the right leg, and spleen removal. Ms. Barman incurred over $300,000 in medical expenses following the accident.

Defendant Bruce Barman is Allison's father and Corporate Executive Vice President of Research and Development for Sealy, Inc. Mr. Barman and his daughter are beneficiaries (or plan members) under the employee medical benefit plan provided by Sealy ("Sealy PPO"). Both Sealy and the Barmans agree that Sealy, as the plan's fiduciary, paid at least $225,000 of Ms. Barman's medical expenses. (Eaton Aff. (I) ¶ 12.) It is undisputed that SafeCo Insurance Company ("SafeCo"), a stop-loss insurance company which issued a policy to Sealy to protect it from catastrophic losses, insured and paid for additional portions of Ms. Barman's medical expenses.[3] (*See id.*)

---

1. The court notes that the Barmans failed to comply with Local Rule of Civil Practice 7.3(d) in filing a summary judgment brief in excess of the 20–page limitation. Despite noncompliance with this rule, the court will consider this brief along with the other materials filed on behalf of the Barmans in deciding the cross motions for summary judgment.

2. The Barmans did not file a response in opposition to Sealy's motion for summary judgment.

3. Stop-loss insurance coverage is commercially purchased insurance. *Thompson v. Tal-* *quin Bldg. Prods. Co.*, 928 F.2d 649, 651 n. 1 (4th Cir.1991). Companies, like Sealy, purchase this type of insurance to be reimbursed for individual claims exceeding a certain amount. *Id.* at 651. From December 1998 to December 1999, SafeCo paid 100% of an individual's medical expenses when Sealy's payments exceeded $200,000. From December 1999 to December 2000, SafeCo paid 100% of an individual's medical expenses when Sealy's payments exceeded $225,000. (Pl.'s Mot. Summ. J. Resp. Opp'n Barmans' Br. Supp. Mot. Summ. J. Ex. B.)

The insurance proceeds at the heart of this case are derived from the car insurance policies covering the accident. Defendant Nationwide Mutual Insurance Company ("Nationwide") issued an insurance policy for the car in which Ms. Barman was a passenger. Defendant State Farm Mutual Automobile Insurance Company ("State Farm") issued an insurance policy for the Barman family. The policy limits under the liability provisions of both policies were $50,000 each. Nationwide paid $6,633.61 directly to the medical health providers to fund Ms. Barman's medical expenses. The remainder of Nationwide's funds, in addition to State Farm's $50,000 proceeds, were at all times within the insurance companies' respective possession. Because neither Nationwide nor State Farm was able to determine the appropriate claimant of the insurance proceeds, the court granted their interpleader claims and allowed them to deposit the funds into a non-interest bearing trust account with the court. As a matter of law, Sealy and the Barmans disagree as to who is entitled to the insurance proceeds offered by Nationwide and State Farm.

According to Section 8.2 of the Sealy PPO, entitled "Subrogation," Sealy argues that it is entitled to the insurance proceeds by virtue of the specific terms of the agreement. Section 8.2 provides, in pertinent part:

> Whenever the Plan pays for benefits for Hospital, surgical, medical, or prescription drug expenses, with respect to any Plan Member, the Plan shall be subrogated to the extent of any payment under this Plan to all of the Plan Member's rights of recovery therefor regardless of the entity or individual from whom recovery may be due. The Plan Member shall do nothing to prejudice such rights and shall do everything necessary to secure such rights ... Any amounts so recovered, whether by the Plan or the Plan Member, and whether recovered by litigation, arbitration, mediation, settlement, contractual agreement or otherwise, and regardless of how such recovery is denominated, shall be apportioned as follows:
>
> (a) first, this Plan shall be reimbursed to the extent of its payments; and
>
> (b) second, if any balance then remains from such recovery, it shall be applied to reimburse the Plan Member and any other party providing benefits to the Plan Member as their interests may appear.
>
> . . . . .
>
> In the event a Plan Member shall recover any amounts to which the Plan is entitled under this Section, the Plan may recover such amounts directly from the Plan Member ....

(Eaton Aff. (II) Ex. A at 41.)

On December 17, 2001, Sealy issued letters to both Nationwide and State Farm notifying them of its subrogation rights under the Sealy PPO to the insurance proceeds. Sealy did not receive the funds and instituted this action in March 2002. Among other things, Sealy seeks equitable restitution in the form of a constructive trust for the insurance proceeds, and enforcement of the plan's subrogation rights based on Section 8.2 of the Sealy PPO.

The Barmans argue that they are entitled to the insurance proceeds pursuant to the make-whole doctrine and the fact that they would not be unjustly enriched by receiving the funds. Additionally, the Barmans argue that they should receive the funds because Sealy is seeking monetary damages guised in the cloak of equitable relief and legal remedies are not authorized by ERISA. In the alternative, the Barmans argue that the court lacks jurisdiction over this matter. According to the Barmans, the Sealy PPO is not self-funded because a stop-loss insurance company

paid a portion of Ms. Barman's medical expenses and thus, the plan is not governed by ERISA.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if an examination of the pleadings, affidavits and other proper discovery materials, viewed in the light most favorable to the non-moving party, indicates that there exists no genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The essential question for the court's determination is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Unless the non-moving party comes forward with specific facts demonstrating a genuine issue for trial, summary judgment is proper as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. ANALYSIS

The court cannot determine the appropriate claimant of the insurance proceeds at issue unless the plan is governed by ERISA and is exempt from state insurance statutes, allowing the court to interpret the plan. Both the Supreme Court and the Fourth Circuit have spoken on the precise exemption issue at stake in this case. The Supreme Court has held that state insurance regulations do not apply to employee benefit plans insofar as those regulations "relate to" the plans.[4] *FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356 (1990). States may not deem self-funded employee benefit plans to be insurance companies or engaged in the business of insurance for purposes of direct state regulation. *FMC Corp.*, 498 U.S. at 61, 111 S.Ct. at 409. Thus, a state insurance regulation such as N.C. Admin. Code tit. 11, r. 12.0319 would not apply to the Sealy PPO if the court finds that the plan is self-funded.

The Barmans argue that the existence of a stop-loss insurance policy effectively negates the Sealy PPO's self-funded status, renders the plan insured, and thus, the plan is not exempt from state law coverage. This exact argument, however, has been considered and rejected by the Fourth Circuit. In *Thompson v. Talquin Bldg. Prods. Co.*,[5] the son of an employee at Talquin Building Products Company was injured in a car accident. *Thompson*, 928 F.2d at 650. The son was covered under his father's employee benefit plan for his medical expenses, totaling approxi-

---

4. The Supreme Court applied three clauses in concluding that ERISA preempts direct state regulation of self-funded employee benefit plans. The first clause is the preemption clause, which provides that any state law relating to an employee benefit plan is preempted by ERISA. 29 U.S.C. § 1144(a). The second clause, the "saving" clause, bestows upon the states the power to regulate insurance, subject to subparagraph (B). 29 U.S.C. § 1144(b)(2)(A). The third clause, the "deemer" clause, provides, in pertinent part, that an employee benefit plan shall not be deemed to be an insurance company or engaged in the business of insurance for purposes of state insurance regulation. 29 U.S.C.

§ 1144(b)(2)(B). In applying these clauses the Court reasoned that

> [s]tate laws directed toward the plans are pre-empted because they relate to an employee benefit plan but are not "saved" because they do not regulate insurance. State laws that directly regulate insurance are "saved" but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws.

*FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356 (1990).

5. 928 F.2d 649 (4th Cir.1991).

mately $63,000. *Id.* at 650–51. The employee benefit plan included stop-loss insurance coverage when an individual's claim exceeded $25,000. *Id.* at 651. The Fourth Circuit upheld the district court's ruling that stop-loss insurance does not convert an otherwise self-funded employee benefit plan into an insured plan. *Id.* at 653. The court reasoned that

> [e]ven with stop-loss coverage, Talquin's Plan is directly liable to Talquin's employees for any amount of benefits owed to them under the Plan's provisions. The purpose of the stop-loss insurance is to protect Talquin from catastrophic losses, it is not accident and health insurance for employees. Instead of covering employees directly, the stop-insurance covers the Plan itself.

*Id.*

Here, Sealy is still liable to its employees for medical benefits in the same way that Talquin was still liable to its employees given its stop-loss insurance coverage. The deductible under SafeCo's policy is $225,000, much more than the $25,000 deductible under the stop-loss insurance policy in *Thompson.* An even more catastrophic loss is required under the Sealy PPO before stop-loss insurance coverage is activated. This fact provides strong support for the notion that SafeCo's policy is not a substitute for the Sealy PPO as the plan members' accident and health insurance provider. The Fourth Circuit's rule that stop-loss insurance does not convert a self-funded ERISA plan into an insured plan applies with equal force to Sealy's PPO.[6] Thus, the Sealy PPO is a self-funded plan governed by ERISA and exempt from state insurance regulations. *See*

*Hampton Indus., Inc. v. Sparrow,* 981 F.2d 726, 730 (4th Cir.1992).

Having answered the exemption question in the affirmative, and noting that the Barmans have not challenged ERISA's preemption with any other state statute,[7] the court will next determine whether Sealy seeks equitable or legal relief in its complaint. According to 29 U.S.C. § 1132(a)(3) ("ERISA § 502(a)(3)"), ERISA authorizes a civil action

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

Notably, legal relief is not recoverable under this statute. The Supreme Court recently interpreted ERISA § 502(a)(3) by drawing key distinctions between legal and equitable relief. In *Great–West Life & Annuity Ins. Co. v. Knudson,*[8] a plan beneficiary, the wife of an employee at Earth Systems, Inc., was rendered quadriplegic in a car accident. *Knudson,* 534 U.S. at 207, 122 S.Ct. at 711. The employee benefit plan covered over $400,000 of her medical expenses, and a stop-loss insurance company, Great–West, paid all except $75,000 of these expenses. *Id.* The plan's reimbursement provision afforded " 'a first lien upon any recovery, whether by settlement, judgment or otherwise,' that the beneficiary receives from the third party . . . ." *Id.* The plan also assigned to Great–West all of its rights to litigate any claim under the reimbursement provision. *Id.* The plan beneficiary and a third party,

---

**6.** Notably, the Barmans have not cited any authority to the contrary from any court, even outside the Fourth Circuit.

**7.** The court notes, however, that the Fourth Circuit ruled North Carolina's anti-subrogation statute was preempted by ERISA because

it interfered with the underlying plan's subrogation rights. *See, e.g., Hampton Indus., Inc. v. Sparrow,* 981 F.2d 726, 728–29 (4th Cir. 1992).

**8.** 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

Hyundai Motor Company, negotiated a $650,000 settlement of which $13,828.70 was allocated under the reimbursement provision of the plan to Great–West. *Id.*, 534 U.S. at 207–08, 122 S.Ct. at 711. Great–West sought injunctive and declaratory relief in district court to be reimbursed for the remainder of the medical expenses incurred. *Id.*, 534 U.S. at 208, 122 S.Ct. at 712.

The Supreme Court held that Great–West was precluded from recouping its funds because it sought legal, as opposed to equitable, relief. *Id.*, 534 U.S. at 210, 122 S.Ct. at 712–13. The Court stated that Great–West was seeking to impose personal liability on the beneficiaries for a contractual obligation to pay money, a remedy typically not available in a court of equity. *Id.*, 534 U.S. at 210–11, 122 S.Ct. at 713. Although Great–West labeled its restitution claim in equitable terms, in reality, it was seeking the classical form of legal relief: money damages. *Id.*, 534 U.S. at 210, 122 S.Ct. at 713; *Local 109 Ret. Fund v. First Union Nat'l Bank*, 2003 WL 152851, at *1 (4th Cir. Jan.23, 2003) ("A plaintiff's decision to label his claim as one seeking traditional forms of equitable relief is not dispositive."). *But cf. Forsling v. J.J. Keller & Assocs., Inc.*, 241 F.Supp.2d 915, 919 (E.D.Wis.2003) ("The mere fact that [the plan] is seeking money does not *ipso facto* turn its action into a legal action for damages ....").

A key element for the Court in making the distinction between legal and equitable restitution was that the beneficiaries did not receive or have the proceeds of the settlement in their possession. The Court reasoned that

> [t]he basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of resti-

tution that petitioners seek, therefore, is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred upon respondents. *Id.*, 534 U.S. at 214, 122 S.Ct. at 715. Although the Court did not view Great–West's claim as an equitable one because the funds had already been dispersed, the Court did leave room for factual scenarios in which restitution in equity could be achieved. "[A] plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.*, 534 U.S. at 213, 122 S.Ct. at 714.

The facts of the present case are distinguishable from *Knudson*. Here, as opposed to *Knudson*, the insurance proceeds are identifiable, have not been dispersed, and prior to this court's order, were in the sole possession of two of the defendants in this case. Sealy is not a general creditor because the funds have not been dispersed and Sealy believes, in good conscience, that the funds belong to it because of the subrogation section of the Sealy PPO.

The funds are currently in the possession of the court in a non-interest bearing account and are clearly traceable to Nationwide and State Farm's insurance policies. *See Great–West Life & Annuity Ins. Co. v. Brown*, 192 F.Supp.2d 1376, 1381 (M.D.Ga.2002) (holding that a fiduciary may seek restitution in equity where the funds in controversy were placed in a non-interest bearing trust account and were clearly traceable to the award from third parties); *IBEW–NECA Southwestern Health and Benefit Fund v. Douthitt*, 211 F.Supp.2d 812, 816 (N.D.Tex.2002) (holding that funds in the possession of the defendant's attorney were clearly tracea-

ble to the defendant and in good conscience belonged to the plaintiff). *But see Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439, 445 (5th Cir.2002) (holding that because the settlement proceeds were in a county court's possession, and not the defendant's, the claimant was seeking only legal relief; therefore, the plaintiff's suit was not authorized under ERISA § 502(a)(3)).

The court views cases in which one of the parties conducts a settlement and disperses the disputed funds as distinguishable from the case at bar. In *Bauhaus USA, Inc. v. Copeland*,[9] as in *Knudson*, the employee benefit plan at issue included a reimbursement provision enabling the plan to recover from any settlement proceeds amounts advanced for medical expenses. *Copeland*, 292 F.3d at 445. The beneficiaries and third-party tortfeasors engaged in a settlement in state court to determine the appropriate claimant of the fund at issue. *Id.* Following the state suit, the plan fiduciary brought a declaratory action in federal court for repayment of the medical benefits conferred. *Id.* In holding that ERISA did not authorize the employer's declaratory judgment, the Fifth Circuit focused solely on the fact that the settlement proceeds were in the registry of the Mississippi Chancery Court, and not in the defendant's possession. *Id.* The court did not acknowledge that the *clear traceability* of the proceeds to a particular fund or property in the defendant's possession is the linchpin under *Knudson* to establish part of the claim for restitution in equity.

Although the Fifth Circuit may have a different interpretation of *Knudson*, this court believes Sealy has satisfied the Supreme Court's requirements for claiming restitution in equity. First, the Barmans did not engage with Nationwide, State Farm, or any third parties in settlement proceedings to disperse the funds and all parties consented to the interpleader order. Sealy claimed entitlement to the funds in good conscience under the subrogation provision of the Sealy PPO, not as a general creditor attempting to impose personal liability on the beneficiary. Second, the *Knudson* Court did not restrict restitution in equity claims solely to situations in which the disputed funds are *currently* in the defendant's possession. Rather, the Court stated that if "money or property identified as belonging in good conscience to the plaintiff *could clearly be traced to* particular funds or property in the defendant's possession," then a claim for restitution in equity could be claimed. *Knudson*, 534 U.S. at 213, 122 S.Ct. at 714 (emphasis added). Even though the funds are not currently in any of the four Defendants' possession, they are clearly traceable to a particular account. In addition, it was only at this court's directive and all the parties' consent that Nationwide and State Farm relinquished the funds; the funds had been in Defendant insurance companies sole possession from the inception of this case. Therefore, Sealy may seek restitution in equity and the court retains subject matter jurisdiction.[10]

---

9. 292 F.3d 439 (5th Cir.2002).

10. The court is unpersuaded by the Barmans' argument that Sealy is not entitled to a constructive trust because it has failed to prove any wrongdoing or unjust enrichment on the Barmans' behalf. As stated in *Knudson*, the court has already mentioned when equitable relief in the form of a constructive trust can be ascertained: "where money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 714, 151 L.Ed.2d 635 (2002). A showing of fraud, wrongdoing or unjust enrichment is simply not required under the Supreme Court's standard.

■ As a substantive matter, Sealy argues that the terms of the subrogation section of the Sealy PPO entitle it to the insurance proceeds; the Barmans argue that the make-whole doctrine overrides the subrogation agreement entitling them to the funds because of their insurmountable losses. The court will first address the plain language of Sealy's subrogation rights agreed to in the Sealy PPO by the Barmans. Contrary to the Barmans' assertion, Section 8.2 of the Sealy PPO includes a priority provision for reimbursement of incurred medical expenses: amounts recovered from third parties, whether recovered by the plan or the plan member, will be applied in the following order: "(a) *first,* the Plan will be reimbursed to the extent of its payments; and (b) then, *if* any balance remains from such recovery, it will be applied to reimburse the Plan Member ...." (Eaton Aff. (II) Ex. A at 41) (emphasis added.) There is no indication that Sealy's right to be reimbursed first is dependent on any particular usage of the advanced funds by the Barmans. In fact, the plan's language is that Sealy's subrogation rights apply "regardless of how such recovery is denominated." (*Id.*) Therefore, the Barmans' contention that the intended use of the insurance proceeds was to fund Ms. Barman's future lost earnings is irrelevant and does not diminish Sealy's unambiguous subrogation rights. *See United McGill Corp. v. Stinnett,* 154 F.3d 168, 172 (4th Cir.1998) ("the plain language of an ERISA plan must be enforced in accordance with 'its literal and natural meaning.'") (quoting *Health Cost Controls v. Isbell,* 139 F.3d 1070, 1072 (6th Cir.1997)). Based on the unambiguous language of the subrogation rights in the Sealy PPO, which was agreed to by the Barmans before the advance of funds, Sealy is entitled to the insurance proceeds in the court's possession.

■ Yet, the court must wrestle with an additional issue before making a final determination as to the appropriate claimant: whether the make-whole doctrine overrides the plain language of the subrogation section of the Sealy PPO. The make-whole doctrine is an equitable insurance doctrine that establishes a ranking of priority between the plan and beneficiary; the beneficiary keeps everything recoverable from third parties until he or she is made whole. *Sunbeam–Oster Co. Group Benefits Plan for Salaried and Non–Bargaining Hourly Employees v. Whitehurst,* 102 F.3d 1368, 1374 (5th Cir.1996). The make-whole doctrine has been incorporated into the body of federal common law to fulfill Congress' intent that ERISA's express provisions should be supplemented when gaps exist in the language. *United McGill Corp.,* 154 F.3d at 171. However, when the purposes of the ERISA plan are written, unambiguous, and bargained-for, application of federal common law is inappropriate because the terms of the plan should be enforced. *Id.* at 173 (holding that application of federal common law would override the plan's reimbursement provision in contravention of ERISA's purposes).

In applying *United McGill Corp.,* the Fourth Circuit answered the precise question of when the make-whole doctrine overrides an ERISA plan's terms. In *In re Paris v. Iron Workers Trust Fund,*[11] an unpublished decision, the ERISA plan contained a subrogation provision entitling the plan to reimbursement of the full amount of the beneficiary's recovery. *In re Paris,* 2000 WL 384036, at \*2. The Fourth Circuit rejected the appellant's argument that the make-whole doctrine should override the subrogation provision because the plan's language was plain and unambiguous. *Id.* The court noted that explicit preclusion of the make-whole doctrine within the plan

11. *In re Paris v. Iron Workers Trust Fund,* 2000 WL 384036 (4th Cir. Apr.17, 2000).

by legalese was not necessary to enforce the subrogation provision. *Id.* at \*3. By forcing plan drafters to reject the make-whole doctrine through legalese, observed the court, the language would not be understood generally by laypersons and would contravene Congress' intent for clear and ordinary terms to explain the plan's provisions. *Id.*

■ This court agrees with the Fourth Circuit's reasoning in *In re Paris.* When an ERISA plan's language is clear and explicit, the court does not have a role in applying federal common law, such as the make-whole doctrine. In this case, the parties are not silent as to who will recover the medical costs expended and in what order. Requiring the parties to explicitly reject the make-whole doctrine with legalese is both unrealistic and redundant when an unambiguous priority provision such as the one in the Sealy PPO is provided. *See Waller v. Hormel Foods Corp.,* 120 F.3d 138, 140 (8th Cir.1997) (holding that standard subrogation language provided plan with priority rights and therefore, overrode the make-whole doctrine); *Cagle v. Bruner,* 112 F.3d 1510, 1522 (11th Cir.1997) ("if the Fund wants to escape the make whole doctrine, it need only include language in the plan explicitly providing the Fund with the right to first recovery, even when a participant or beneficiary is not made whole."); *Barnes v. Independent Auto. Dealers Ass'n of California Health and Welfare Benefit Plan,* 64 F.3d 1389, 1395 (9th Cir.1995) ("We would not apply the interpretive 'make-whole rule' as a 'gap-filler' if the subrogation clause in the Plan document specifically allowed the Plan the right of first reimbursement out of any recovery ... even if Barnes were not made whole."); *Alves v. Silverado Foods, Inc.,* 2001 WL 237314, at \*8 (10th Cir. Mar.9, 2001) (holding that even if the make-whole doctrine applied as a default rule, priority language in plan overrode it). Section 8.2 of the Sealy PPO is explicit as

to the priority method of reimbursement: the plan is reimbursed *first,* and *if* additional funds remain after the plan is satisfied, the plan members may recover. Because there are no gaps or conflicts within the plan in this respect, the court will enforce Sealy's subrogation rights. *In re Paris,* 2000 WL 384036, at \*3.

Although this court is conscious of the Barmans' tremendous financial, emotional, and physical losses, Sealy cannot be forced to rescind its contractual rights to subrogation as a result. The court must honor the plain and unambiguous language of the Sealy PPO which is an ERISA governed, self-funded plan, exempt from state insurance regulations. The court holds that Sealy is entitled to the remainder of the insurance proceeds, $93,366.39, which are currently in the court's possession.

## IV. CONCLUSION

For the reasons set forth above, Defendants Allison and Bruce Barman's Motion for Summary Judgment will be denied, and Plaintiff Sealy's Motion for Summary Judgment will be granted.

A judgment in accordance with this memorandum opinion will be entered contemporaneously herewith.

### *JUDGMENT*

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants Allison Barman and Bruce Barman's Motion for Summary Judgment [11] is denied, and Plaintiff Sealy Inc.'s Motion for Summary Judgment [38] is granted.