ADMINISTRATIVE COMMITTEE OF THE WAL–MART ASSOCIATES HEALTH AND WELFARE PLAN, Plaintiff,

v.

**Melvin WILLARD, Defendant.**

**No. CIV.A.02–2571–KHV.**

United States District Court, D. Kansas.

Feb. 13, 2004.

Christopher R. Hedican, Baird Holm Law Firm, Omaha, NE, for Plaintiff.

Fred Spigarelli, Thomas E. Hayes, Lori A. Bolton Fleming, Spigarelli, McLane & Short, Pittsburg, KS, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Melvin Willard suffered injuries when a pharmacy employee for Wal–Mart Stores, Inc. erroneously filled his prescription in June of 2001. The Wal–Mart Associates Health and Welfare Plan, an employer-sponsored health plan, provided coverage for Willard's medical expenses. Wal–Mart Stores agreed to settle plaintiff's claim against it and having done so, the health plan filed suit to establish an enforceable lien on the settlement proceeds. On a trial to the Court, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.[1]

1. On December 18, 2003, the Court held oral argument on *Defendant's Motion For Summary Judgment* (Doc. # 72) filed August 29, 2003 and plaintiff's *Amended Motion For Summary Judgment* (Doc. # 76) filed September 2, 2003. In the pretrial order, the parties agreed that this case could be resolved on the cross motions for summary judgment. *See Pretrial Order* (Doc. # 95) filed October 29, 2003 at 22. At oral argument, the parties agreed that a formal trial was not necessary and that the Court could instead treat the memoranda on the cross motions for summary judgment as proposed findings of fact and conclusions of law and rule as if the arguments and evidence had been submitted at a bench trial.

### Findings Of Fact

Melvin Willard is a resident of Bourbon County, Kansas. On June 11, 2001, the Wal–Mart pharmacy in Fort Scott, Kansas erroneously filled a prescription for him. As a result, he suffered injuries and incurred medical treatment and bills totaling $534,919.68. Because Willard was a covered beneficiary under the Wal–Mart Associates Health and Welfare Plan ("the Plan"), it paid all of his medical bills.

On August 27, 2002, Wal–Mart Stores, Inc. ("Wal–Mart") and Willard reached a confidential agreement for a settlement in excess of plaintiff's medical bills. It stipulated that Wal–Mart would hold back $534,919.68 (the amount of the medical bills), and file a declaratory judgment action against Willard and the Plan, to determine whether the Plan had an enforceable lien on that amount.[2] The parties also stipulated that Wal–Mart's duty to pay the $534,919.68 balance to Willard was contingent on the Court's finding that the Plan did not have an enforceable lien.

The 1997 Associates Health and Welfare Trust (the "Trust") receives contributions from Wal–Mart, and from current and former employees and their dependents. It uses those contributions to pay participant claims and operating expenses for the Plan.[3] The Trust holds the Plan assets and once they are placed in the Trust, it must maintain those assets separate from Wal–Mart. A Board of Trustees, which consists of two members appointed by the Wal–Mart Board of Directors, administers the Trust. The current trustees are executive officers of Wal–Mart. Plan Trustees have exclusive power regarding investment of the funds into the Plan.

Wal–Mart appointed the initial members of the Plan's Administrative Committee. The Administrative Committee is the Plan administrator unless and until Wal–Mart appoints a replacement. Wal–Mart may terminate the Plan without the consent of the Plan's Administrative Committee. Wal–Mart may also remove any member of the Administrative Committee and fill any vacancies, as follows:

> In the event an Administrative Committee member resigns, dies or is removed, the remaining Administrative Committee members shall appoint a successor member and provide reasonable notice of such appointment to the Compensation Committee of [Wal–Mart's] Board of Directors; provided, however, such Compensation Committee shall have reserve powers to fill any Committee vacancy or to add additional members to the Committee with written notice to the other members of the Committee.

Plan Wrap Document ¶ 4.1, Exhibit 10 to *Defendant's Index Of Exhibits* (Doc. # 73).

Wal–Mart has the ability to control the Administrative Committee, and it therefore has indirect control over the Plan, even though the Administrative Committee administers it. Wal–Mart is responsible for oversight of the Administrative Committee and the Trustees. The Administrative Committee includes employees of both Wal–Mart and the Plan. The Plan guarantees each member of the Administrative Committee full indemnity by Wal–Mart for any claims or liability.[4] Members of the

---

2. The settlement agreement did not require Wal–Mart to file suit by a certain deadline, and to date, except to the extent that it intervened in this action, it has not done so.

3. Wal–Mart appointed the trustees under the 1997 Agreement and Declaration of Trust which is the trust document currently in effect. The trust document created the trust fund which holds Plan assets and sets forth the duties and powers of the Plan Trustee and the Administrative Committee.

4. Wal–Mart has also purchased insurance which provides indemnification for the Plan for loss of assets because of dishonesty, dissolution or forgery. *See* Exhibit 14 to *Defendant's Index Of Exhibits* (Doc. # 73) at 2. Wal–Mart is the named insured on the policy. *See id.* Plaintiff maintains that the policy

Administrative Committee serve without bond and receive no compensation for their services.

The agent for service of legal process for the Plan is Robert K. Rhoads, Senior Vice–President of Wal–Mart. During 2002, Rhoads was an executive officer of Wal–Mart.

Wal–Mart, as Plan sponsor, contracted with Blue Cross Blue Shield of Kansas ("BCBS") to allow plan participants to use the BCBS Provider Network. *See* BCBS of Kansas, Inc. Competitive Allowance Program Provider Network Utilization Agreement ("Utilization Agreement"), attached as Exhibit 16 to *Defendant's Index Of Exhibits* (Doc. # 73). Wal–Mart entered this agreement for the exclusive benefit of the Plan, to assist in controlling the cost of services to participants. In addition to allowing access, BCBS agreed to calculate the charges for services to plan participants, to assure that providers did not charge more than BCBS negotiated rates and to forward a statement of charges to Wal–Mart for payment. The Utilization Agreement also provides:

> *Non–Assumption of Risk by BCBSK.* It is understood and agreed by the parties hereto that BCBSK is providing certain administrative services only and is not assuming any financial risk or obligation with respect to payment of claims by virtue of its execution and performance of this Agreement.

*Id.,* ¶ 5.1.

Wal–Mart has a Claims Administration division. The Administrative Committee

has delegated to the Wal–Mart Claims Administration division the power to administer the Plan. The Plan is required to file an Exempt Organization Business Income Tax Return, and all books related to that return are in the care of "Wal–Mart Stores c/o Group Benefits." The Plan's Customer Service Department is "Wal–Mart Claims Administration." Any appeal of a denial of medical benefits under the Plan must be made to the "Appeals Department Wal–Mart Stores, Inc." The Plan advises participants that "[i]t is Wal–Mart's goal that you understand your benefits options.... Inquiries are to be made to Benefits Customer Service, Wal–Mart Claims Administration, 922 W. Walnut Ste A, Rogers, Arkansas."

On November 13, 2002, the Administrative Committee filed this suit against Willard, seeking a declaration that the Plan is entitled to recover $534,919.68 under its reimbursement and subrogation provision. On December 23, 2002, Wal–Mart filed a motion to intervene, which the Court sustained. The Court later granted Wal–Mart's motion to deposit $534,919.68 into the Court registry and dismissed Wal–Mart as a party.[5] *See Order* (Doc. # 27) filed April 1, 2003.

Wal–Mart had possession of the settlement proceeds until April 7, 2003, when it deposited them into the Court registry. In July of 2003, by agreement of the parties, the Court dispersed the proceeds to plaintiff pending resolution of this case.[6]

provides indemnification for Administrative Committee members, but he does not cite specific record evidence which supports this conclusion.

5. Willard did not object to Wal–Mart's initial motion to intervene and deposit the funds, but he later argued that Wal–Mart should not be dismissed and that the parties should be realigned to make it plaintiff. The Court overruled Willard's objection because (1) he did not raise it in response to Wal–Mart's initial

motion to intervene, (2) he did not provide the Court a copy of the settlement agreement which required Wal–Mart to be plaintiff in this action and (3) neither party had a pending claim against Wal–Mart.

6. In addition to Willard's medical bills, which were directly related to the negligence of the Wal–Mart pharmacy employee, Willard had ongoing medical expenses. After Willard and Wal–Mart consummated their settlement agreement, the Plan stopped paying the ongo-

On December 18, 2003, the Court vacated its order to disperse the proceeds and ordered plaintiff to return the disputed proceeds to the Court registry.

Willard has never had possession of the funds in question. If they are awarded to the Administrative Committee, it will return them to the Trust for payment of medical claims of other participants. Accordingly, future contributions of Wal-Mart and Plan participants will be reduced by $534,919.68.

The 2002 Summary Plan Description ("SPD")[7] and the 2001 Plan Wrap Document are the controlling plan documents in this case.[8] *See Pretrial Order* (Doc. # 95), Stipulation No. 7.

The SPD includes a reimbursement and subrogation provision, as follows:

**Right to Reduction, Reimbursement and Subrogation**

The plan has the right to 1) reduce or deny benefits otherwise payable by the Plan and 2) recover or subrogate 100 percent of the benefits paid or to be paid by the Plan for covered persons to the extent of any and all of the following payments:

• Any judgment, settlement or payment made or to be made because of an accident or malpractice, including but not limited to other insurance.

\*   \*   \*   \*   \*   \*

**Cooperation Required**

The Plan requires covered persons or their representatives to cooperate in order to guarantee reimbursement to the Plan from *third party benefits*. Failure to comply with this request will entitle the Plan to withhold benefits due to covered persons under the Plan Document. Covered persons or their representatives may not do anything to hinder reimbursement of overpayment to the Plan after you have accepted benefits.

These rights apply regardless of whether such payments are designated as payment for, but not limited to:

• Pain and suffering
• Medical Benefits
• Other specified damages; or
• Whether the participant has been made whole (i.e. fully compensated for his/her injuries)

NOTES:

ing expenses because it had not received reimbursement for the $534,919.68 which it had already paid.

Willard appealed that decision, but on May 27, 2003, the Administrative Committee notified him that it would continue to deny benefits under the reimbursement and subrogation provision. To resolve this conflict, the parties agreed that the Administrative Committee would pay ongoing medical bills, but that it would receive the disputed proceeds from the Court registry and hold them until the case was resolved. The parties have apparently resolved their dispute as to ongoing medical bills and this case is limited solely to the issue of reimbursement and subrogation.

7. ERISA requires that the administrator of each employee benefit plan distribute a Summary Plan Description to participants and beneficiaries. *See* 29 U.S.C. § 1021(a)(1). The Summary Plan Description must be "written in a manner calculated to be understood by the average plan participant, and ... be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). "Because the [summary plan description] best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir.1996).

8. The Plan Wrap Document contains the actual terms of the Plan. *See* Plan Wrap Document ¶ 1.1. The 2001 Plan Wrap Document incorporates by reference the terms of the 2002 SPD.

*The Plan's right to reduction, reimbursement, and subrogation applies to any funds recovered from *another party* or on behalf of the estate of any covered person.

2002 SPD at 42–43 (emphasis added), attached as Exhibit 2 to *Defendant's Index Of Exhibits* (Doc. # 73) filed August 30, 2003. The SPD and the Plan Wrap Document do not define the terms "third party" and "another party." Christy Herbaugh, a Reimbursement Specialist for the Plan, is responsible for administering the Plan.[9] Herbaugh and her assistants interpret the reimbursement terms of the Plan as written. They do not use extrinsic written definitions or other documents to help interpret the reimbursement terms of the Plan.

According to the Administrative Committee, a plan participant is a "party" to the Plan, and not a "third party" or "another party," because the Plan Wrap Document includes plan participants as part of the Plan and they partially fund the Plan. The Administrative Committee denies that Wal–Mart is a party to the Plan even though Wal–Mart—like Plan participants—also partially funds the Plan.

Both parties seek declaratory relief under 29 U.S.C. § 1132(a)(3). The Administrative Committee seeks a declaration that under the reimbursement and subrogation provision, it is entitled to recover the medical bills which it paid on Willard's behalf. Willard seeks a declaration that plaintiff is not entitled to reimbursement or subrogation. He argues that (1) the relief sought by plaintiff is "legal relief," not "appropriate equitable relief" under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), and that the Court therefore lacks subject matter jurisdiction over plaintiff's claim; (2) the subrogation provision applies to payments by "third parties" and not those by the Plan sponsor; (3) because the Administrative Committee is a tortfeasor, equitable relief is not available to it; and (4) Kansas state law precludes enforcement of the subrogation provision.

### Conclusions Of Law

As a preliminary matter, plaintiff seeks leave to amend the pretrial order to include a request for equitable relief in the form of a constructive trust and equitable restitution. *See Plaintiff's Motion To Amend Pretrial Order And To Amend Motion For Summary Judgment* (Doc. # 105) filed January 5, 2004. In the current pretrial order, plaintiff seeks a declaration that under the plan reimbursement and subrogation provision, it is entitled to recover from the settlement proceeds the medical bills which it paid on Willard's behalf. For reasons explained below, the Court finds that under 29 U.S.C. § 1132(a)(3), plaintiff is entitled to that relief. Therefore, plaintiff's motion to amend to add additional theories of relief is moot.

### I. Plaintiff Seeks "Appropriate Equitable Relief" Under 29 U.S.C. § 1132(a)(3)

Willard argues that the Court lacks subject matter jurisdiction over plaintiff's claim for declaratory relief because it seeks "legal relief" which is not available under 29 U.S.C. § 1132(a)(3). Plaintiff maintains that it seeks declaratory relief, a traditionally equitable remedy.

ERISA authorizes a fiduciary to bring suit to obtain "appropriate equitable relief." Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Under Section 502(a)(3), "equitable relief" means those categories of relief that were "typically available in equity." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124

9. Herbaugh is employed and paid by Wal–Mart. Herbaugh also serves on the Administrative Committee but she does not receive compensation for that position.

L.Ed.2d 161 (1993). The Supreme Court recently addressed the scope of equitable relief which is available under Section 502(a)(3). *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In *Great–West*, Janette Knudson, who was a beneficiary under an ERISA health plan, suffered severe injuries in a car accident. Under an agreement with the plan, Great–West provided stop-loss insurance for claims in excess of $75,000. The plan paid approximately $410,000 of Knudson's medical expenses. Knudson negotiated a $650,000 settlement with the tortfeasor, which allocated approximately $257,000 to a special needs trust for Knudson's medical care, $374,000 to her attorneys, $5,000 to reimburse the California Medicaid program and $14,000 to Great–West for medical expenses. *Id.* at 207–08, 122 S.Ct. 708. Under a plan reimbursement provision, the plan was authorized to recoup from the beneficiary any benefit payments which the beneficiary was entitled to recover from a third party. *Id.* at 207, 122 S.Ct. 708. The plan assigned to Great–West its rights under the reimbursement provision and Great West received a check for $14,000, representing its allocated share of Knudson's settlement.

Great–West never cashed the check but it filed suit under Section 502(a)(3) in federal court, seeking injunctive and declaratory relief to enforce the reimbursement provision of the plan. *Id.* at 208, 122 S.Ct. 708. The Supreme Court ultimately held that Great–West did not seek "appropriate equitable relief" under Section 502(a)(3) because it sought a legal remedy, *i.e.* to impose personal liability on Knudson for benefits it had conferred upon her. *Id.* at 214, 122 S.Ct. 708.

To define the scope of appropriate equitable relief, the Supreme Court looked at the historical distinction between actions at law and those in equity and, in particu-

lar, the distinction between restitution *at law* and restitution *in equity*. Restitution at law was generally available where a plaintiff could not assert title or right to possession of particular property, but could show just grounds for recovering money to pay for some benefit which defendant had received from him. *Id.* at 213, 122 S.Ct. 708. Because the plaintiff in such cases sought to obtain a judgment imposing personal liability upon the defendant, courts characterized such claims as legal ones. *Id.* In contrast, restitution in equity ordinarily was available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* Because Great–West did not seek restoration of particular funds or property in Knudson's possession, the Supreme Court characterized the remedy as a legal one not available under Section 502(a)(3).

In this case, the Administrative Committee maintains that it seeks a declaratory judgment, a traditionally equitable remedy, and that this action is therefore proper under Section 502(a)(3). Under *Great–West*, however, the label (an action for declaratory judgment) is not dispositive. *See id.* at 212 ("not all relief falling under rubric of restitution is available in equity"); *see also Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439, 450 (5th Cir.2002) (Wiener, J., dissenting). "Almost invariably ... suits seeking (whether by judgment, injunction, *or declaration* ) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id.* at 210 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 918–19, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (Scalia, J., dissenting)) (emphasis added). The Court therefore must go beyond the label of plaintiff's action and de-

termine whether the substance of the requested relief is legal or equitable.

Since *Great–West*, several courts have addressed whether a plan or a plan administrator may maintain an action for "appropriate equitable relief" to enforce subrogation rights after a plan beneficiary has settled with or received a judgment from a third party. These courts, like the Supreme Court in *Great–West*, have focused on the location of the disputed funds at the time the plan or plan administrator files suit. *See Admin. Comm. of Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan v. Varco*, 338 F.3d 680 (7th Cir.2003); *Westaff (USA) Inc. v. Arce*, 298 F.3d 1164 (9th Cir.2002), *cert. denied*, 537 U.S. 1111, 123 S.Ct. 901, 154 L.Ed.2d 784 (2003); *Bauhaus*, 292 F.3d 439; *see also Wellmark, Inc. v. Deguara*, 257 F.Supp.2d 1209, 1216 (S.D.Iowa 2003) (possession theory is correct reading of *Great–West*; suit permitted under Section 502(a)(3) if participant possesses clearly identifiable proceeds). If the plan beneficiary does not have possession of the disputed proceeds, courts generally do not permit the plan to sue the beneficiary for equitable relief under a subrogation or reimbursement provision. *See Pan–Am. Life Ins. Co. v. Bergeron*, 82 Fed. Appx. 388, 391–92 (5th Cir. 2003); *Westaff*, 298 F.3d at 1167; *Bauhaus*, 292 F.3d at 445 (declaratory relief not available where funds are not in plan participant's possession); *cf. Varco*, 338 F.3d at 687 (because funds are identifiable, have not been dissipated and are in plan participant's possession, action to impose constructive trust could be maintained); *Sealy, Inc. v. Nationwide Mut. Ins. Co.*, 286 F.Supp.2d 625, 632 (M.D.N.C.2003) (equitable action permitted because defendants had possession of funds until court ordered them deposited into court registry).

Here Wal–Mart, a non-party, deposited the disputed funds into the Court registry. Neither the Administrative Committee or Willard has control over the funds at this time.[10] Courts have split on the question whether *Great–West* allows a plan to seek equitable relief where the disputed funds are in a court registry. *Compare Bauhaus*, 292 F.3d at 445 (*Great–West* bars action to seek settlement proceeds in possession of court registry) with *Sealy*, 286 F.Supp.2d at 632 (equitable action permitted because defendants had possession of funds until court ordered them deposited into registry). At least one court has permitted a claim for equitable relief where the plan participant placed the amount in controversy, which came directly from a third party settlement, in a trust account subject to resolution by the court. *See Great–West Life & Annuity Ins. Co. v. Brown*, 192 F.Supp.2d 1376, 1381 (M.D.Ga. 2002). In addition, the Seventh Circuit has held that a plan administrator's suit under Section 502(a)(3) for a constructive trust over settlement funds held by the participant's attorney "nestles comfortably" within the ERISA concept of equity. *Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir.2000).

■ Here, the Court has custody of "clearly identifiable proceeds" which are traceable to the settlement agreement between Wal–Mart and Willard. Plaintiff's suit to obtain declaratory relief with regard to those proceeds is equitable in nature. Because the proceeds are in the registry of the Court, plaintiff can assert a claim against those proceeds without imposing a general personal liability on Wil-

---

**10.** As explained above, by agreement of the parties, the Administrative Committee temporarily had possession of the funds pending resolution of this case. On December 18, 2003, however, the Court vacated its order to disperse the proceeds and ordered plaintiff to return the proceeds to the Court registry.

lard, which was the legal remedy that *Great–West* held is not available under Section 502(a)(3). *See Bauhaus,* 292 F.3d at 451 (dissent). In contrast to *Great–West,* the proceeds in this case have not been dispersed to interested third parties. The Plan seeks *in rem* relief against the proceeds in the Court's possession, not a legal remedy of general liability against Willard. *See id.* This case is closely analogous to an interpleader action, which courts ordinarily characterize as an equitable action controlled by equitable principles.[11] *See United States v. Major Oil Corp.,* 583 F.2d 1152, 1159 (10th Cir.1978). In these circumstances, the Plan's claim is equitable in nature.

Willard argues that because he never had possession of the disputed funds, the Plan cannot seek equitable relief from him. As explained above, where a neutral stakeholder such as a court registry has possession of disputed funds which are traceable to a third party settlement, the plan or one of its participants can seek a declaratory judgment as to ownership of the funds. The fact that Willard never had possession of the funds does not alter the nature of the relief which plaintiff seeks.[12]

■ Furthermore, even if *Great–West* mandates that the funds must be in Willard's possession before "appropriate equitable relief" is available under Section 502(a)(3), the Court has jurisdiction to hear plaintiff's claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. Given the ongoing controversy as to rightful ownership of the funds, the Administrative Committee could have filed suit under the Declaratory Judgment Act to determine the parties' rights as to those funds. The Administrative Committee was not required to do so because, as explained above, it has a valid claim for appropriate equitable relief under Section 502(a)(3) of ERISA. In the alternative, however, to prevent manifest injustice, the Court liberally construes the pretrial order to include a request for declaratory relief both under ERISA and the Declaratory Judgment Act. *See* Fed.R.Civ.P. 16(e).

## II. Plan Interpretation

The Administrative Committee seeks a declaration that under the SPD subrogation and reimbursement provision, it is entitled to the disputed funds in the Court registry. Willard maintains that the provision does not apply because the tortfeasor with which he settled—Wal–Mart—is not a "third party" or "another party" under the provision.

### A. *Standard Of Review*

■ The Court must first decide what standard of review applies to the Administrative Committee's determination that under the SPD, Willard must reimburse it for medical bills which it paid.[13] If the benefit plan gives the administrator or fiduciary discretionary authority to deter-

---

11. Although Wal–Mart was an intervenor and not a plaintiff, it essentially has been a stakeholder with funds claimed by two different parties—the same scenario as a typical interpleader action. Wal–Mart deposited the funds into the Court registry and asked the Court to determine whether the Plan or Willard was entitled to them.

12. Willard concedes that the Court has jurisdiction over his counterclaim, which seeks declaratory relief under Section 502(a)(3) to recover the funds in the Court registry. Willard contends that the Court has jurisdiction

to hear his counterclaim for equitable relief under Section 502(a)(3), but not plaintiff's claim for equitable relief under the same ERISA provision. Except for the outcome, however, both parties seek the same relief—a declaratory judgment as to rightful ownership of the disputed funds in the Court registry. Accordingly, if the Court has jurisdiction over the claim of either party, it can declare the rights of the parties to the disputed funds.

13. The additional question whether the reimbursement and subrogation provision (as interpreted by the Administrative Committee) is

mine eligibility for benefits or to construe the terms of the plan, the Court applies an arbitrary and capricious standard to review a plan administrator's decisions. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir.1999). In *Firestone*, the Supreme Court specifically limited its holding "to the appropriate standard of review in § 1132(a)(1)(B) [Section 502(a)(1)(B) ] actions challenging denials of benefits based on plan interpretations" and did not express any view "as to the appropriate standard of review for actions under other remedial provisions of ERISA." *Firestone*, 489 U.S. at 108, 109 S.Ct. 948.

This case does not involve an administrator's determination of benefits, but an administrator's decision to seek reimbursement under the terms of an ERISA plan. As noted above, both parties seek equitable relief under Section 502(a)(3). Therefore, *Firestone* does not directly apply. In *Firestone*, however, the Supreme Court applied general principles of trust law in formulating the appropriate standard of review under Section 502(a)(1)(B). Several courts have concluded that in Section 502(a)(3) cases as well, "the arbitrary and capricious standard applies to decisions of a plan administrator cloaked with sufficient discretionary authority." *Engle v. Wal–Mart Assocs. Health & Welfare Plan*, 48 F.Supp.2d 1114, 1118 (N.D.Ind.1999); *see Bd. of Admin. v. Huntsman*, 187 F.3d 634, 1999 WL 591458, at *3 n. 3 (6th Cir. July 27, 1999) (claim under Section 502(a)(3) subject to clearly erroneous review); *Crosby v. Bowater Inc. Retirement Plan For Salaried Employees of Great N. Paper, Inc.*, 212 F.R.D. 350, 360 (W.D.Mich.2002) (where plan grants administrator deference, logic of *Firestone*

favors clearly erroneous standard of review); *Bechtold v. Woods*, 2000 WL 1029182, at *3 (N.D.Ill.2000) (same standard should apply where issue is determination of benefits eligibility based on plan interpretation). "Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Firestone*, 489 U.S. at 111, 109 S.Ct. 948; *see* Restatement (Second) of Trusts § 187 (1959) (where discretion is conferred upon trustee, its exercise is not subject to control by court except to prevent abuse of discretion).

The general principles of trust law articulated in *Firestone* apply equally to a plan decision to assert reimbursement and subrogation rights. *See Bill Gray Enters., Inc. Employee Health & Welfare Plan*, 248 F.3d 206, 217–18 (3d Cir.2001); *Sunbeam–Oster Co., Inc. Group Benefits Plan v. Whitehurst*, 102 F.3d 1368, 1373 (5th Cir.1996); *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1295–96 (7th Cir.), *cert. denied*, 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993); *Baxter v. Lynn*, 886 F.2d 182, 187 (8th Cir.1989); *Sanders v. Scheideler*, 816 F.Supp. 1338, 1342 (W.D.Wis.1993), *aff'd*, 25 F.3d 1053, 1994 WL 234497 (7th Cir.1994). By instituting litigation against a participant based on a subrogation provision, the plan administrator necessarily relies on its interpretation of the plan. *See Bill Gray Enters.*, 248 F.3d at 217 n. 10. Accordingly, based on general principles of trust law, the Court applies an arbitrary and capricious standard to a plan administrator's interpretation of a reimbursement and subrogation provision if "the benefit plan gives the administrator or fiduciary discretionary authority ... to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948.[14]

---

enforceable under Kansas state law is a question for the Court. *See infra* text, part IV.

**14.** Relying on *Lefler v. United HealthCare of Utah, Inc.*, 162 F.Supp.2d 1310 (D.Utah

In this case, the Plan administrator has authority to interpret the Plan. Specifically, the Plan Wrap Document states:

(a) The Plan Administrator shall have the sole discretion and authority to control and manage the operation and administration of the Plan.

(b) The Plan Administrator shall have complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, supply omissions, and determine the benefits payable under a Welfare Program. All decision[s]

2001), *aff'd,* 72 Fed. Appx. 818 (10th Cir. 2003), Willard argues that where a plaintiff seeks relief under Section 502(a)(3), the Court should apply a de novo standard of review. In *Lefler,* insured employees alleged that their insurer had improperly calculated benefits and breached fiduciary duties under a plan when it failed to pass through to them certain financial benefits which the insurer had secured through negotiated agreements with providers. *See id.* at 1319. Based on the insurer's plan interpretation, the insured employees sought relief under Section 502(a)(1)(B) for denial of benefits. Under Section 502(a)(3), they also sought relief for breach of fiduciary duty and violation of state law.

The district court applied an arbitrary and capricious standard of review to plaintiffs' claim for benefits under Section 502(a)(1)(B), but noted that because plaintiffs' claim under Section 502(a)(3) implicated defendant's fiduciary responsibilities, it would apply a de novo standard of review to that claim. *See id.* In the end, the district court held that plaintiffs could not maintain a claim for equitable relief under Section 502(a)(3) because they had a viable (though ultimately unsuccessful) claim under Section 502(a)(1)(B). *See id.* at 1325.

In this case, in contrast to *Lefler,* the Administrative Committee asserts no claim that Willard breached his fiduciary duty to the Plan by failing to reimburse it. In addition, the correct standard of review under Section 502(a)(3) was moot in *Lefler* because the district court found that plaintiffs could not maintain a claim under Section 502(a)(3) for other reasons. *See id.* Finally, based on the general trust principles outlined in *Firestone,*

and interpretations of the Plan Administrator made in good faith pursuant to the Plan shall be final, conclusive and binding on all persons, subject only to the claims procedure, and may not be overturned unless found by a court to be arbitrary and capricious.

Plan WRAP Document ¶ 4.2 (a, b). The Plan expressly gives the administrator discretion to interpret the Plan. The Court therefore should apply the arbitrary and capricious standard in reviewing the administrator's decision to seek reimbursement of benefits paid under the Plan.[15] For

the Court finds that an arbitrary and capricious standard should be applied in this case.

15. Under the arbitrary and capricious standard of review, a court "may not overturn a plan administrator's decision if it was reasonable, given the terms of the plan, and made in good faith." *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir.1999). The Tenth Circuit has explained this as follows:

When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.

*Kimber,* 196 F.3d at 1098.

In addition, where a conflict of interest exists, the conflict must be weighed as a factor in determining whether there was an abuse of discretion. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 826–27 (10th Cir.1996). The Tenth Circuit has found that "the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged, such as trustee bias in favor of a third-party or self-dealing by the trustee." *Chambers,* 100 F.3d at 827 (quoting *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 895 (10th Cir.1988)). A reviewing court must use a "sliding scale" approach under which "the reviewing court will always apply an arbitrary and capricious standard, but the court must

reasons explained below, however, the Court finds that the precise standard of review is irrelevant because under either the arbitrary and capricious standard or a de novo standard, the Administrative Committee's Plan interpretation is correct.

### B. Interpretation Of Subrogation Provision

In interpreting an ERISA plan, the Court examines the plan documents as a whole and, if unambiguous, construes them as a matter of law. *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir.1996). The objective in construing the plan documents is to ascertain and carry out the true intentions of the parties by giving the language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1202 (10th Cir.1992). "[W]ords cannot be written into the agreement imparting an intent wholly unexpressed when it was executed." *Id.* (quoting *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 241 Kan. 580, 586, 738 P.2d 866, 871 (1987)). Ambiguity exists when a plan provision is "reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of a term." *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1290 (10th Cir.2000) (quotations and citations omitted), *cert. denied*, 531 U.S. 1077, 121 S.Ct. 774, 148 L.Ed.2d 672 (2001).

As noted, the subrogation provision in the SPD provides that the Plan has the right to "recover or subrogate 100 percent of the benefits paid· or to be paid by the Plan for covered persons to the extent of any and all ... payments ... [of][a]ny

judgment, settlement or payment made or to be made because of an accident." SPD at 42. The Plan is entitled to recovery or subrogation whether such payments are designated as payment for pain and suffering, medical benefits or other specified damages, and whether the participant has been made fully compensated for his injuries. *See id.*

The Plan asserts that it is entitled to reimbursement from the funds in the Court registry because it determined that the SPD required reimbursement from "any settlement" and that the settlement between Wal–Mart and Willard fell within the scope of that provision. The Court agrees with the Plan's interpretation.

The subrogation provision is extremely broad, reaching "*any and all* ... payments" of "*[a]ny* judgment, settlement or payment." SPD at 42 (emphasis added). The word "any" is commonly understood to mean "one, no matter what one" or "one or more indiscriminately from all those of a kind." Webster's Third New Int'l Dictionary at 97. Accordingly, the common and ordinary meaning of the phrase "any and all ... payments [from] ... any settlement" would include Wal–Mart's settlement payment to Willard.

Willard argues that Plan's right to reimbursement is limited to recovery of "third party benefits." Under the bold title "Cooperation Required," the SPD requires covered persons to cooperate to guarantee reimbursement to the Plan from "third party benefits." *See* 2002 SPD at 42. Such reference merely describes a participant's obligation to cooperate—it does not attempt to define the source of payments which are subject to subrogation. The

---

decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Chambers,* 100 F.3d at 825. Here, the Court need not examine the seriousness of any al-

leged conflict because the Administrative Committee's interpretation of the Plan was proper under even a de novo standard of review.

broad subrogation clause refers to any and all judgments, settlements and payments, not "third party" settlements and payments. It is therefore irrelevant whether Wal–Mart is technically qualified as a "third party." [16]

Willard also argues that the Plan's right to reimbursement is limited to "funds recovered from another party." This argument is premised on the SPD notes section, which—after the subrogation provision—states that the Plan's right of subrogation applies to "any funds recovered from another party by or on behalf of the estate of any covered person." 2002 SPD at 43. Although the law recognizes many different types of "es-

tates," see Black's Law Dictionary (7th Ed.) at 567–70, an estate of an individual most commonly refers to the collective property one leaves after death. See id. at 567. The note therefore applies only if the participant is deceased. Even if the note applies to living participants and the Court read into the Plan a requirement that any payment be from "another party," Wal–Mart would qualify as "another party" for the same reasons that it is a "third party." [17]

Finally, Willard argues that Wal–Mart is not a "third party" or "another party" under the subrogation provision because under ERISA, it is a "party in interest" to the Plan. See 29 U.S.C. § 1002(14)(C).

---

16. In context, however, the Court interprets "third party" as any person or entity other than the Plan or the covered participant. At least one court has adopted a similar definition in the ERISA context. See Bill Gray Enters., 248 F.3d at 220 (term "third party" in subrogation provision is not ambiguous because term clearly refers to "any person or entity other than the Plan and the covered individual"). The "third party benefits" language summarizes the types of payments that are subject to subrogation, i.e. benefits paid to the participant by someone other than the Plan or the participant himself. Such language is appropriate because an individual ordinarily does not receive a "judgment, settlement or payment" from himself—the payment is from someone else such as his insurance company or an alleged tortfeasor. Likewise, the Plan cannot logically have a right of subrogation as to payments that it has made to the participant.

This commonsense definition of "third party" is supported by the ERISA statutory framework. ERISA recognizes the legal distinction between an employee benefit plan and an employer or plan sponsor. In particular, ERISA permits an employee benefit plan to sue or to be sued as a distinct entity, 29 U.S.C. § 1132(d)(1), and provides that "[a]ny money judgment against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person," 29 U.S.C. § 1132(d)(1). Moreover, "the fiduciary requirements of ERISA specifically insulate the

trust from the employer's interest." N.L.R.B. v. Amax Coal Co., 453 U.S. 322, 333, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). ERISA vests the "exclusive authority and discretion to manage and control the assets of the plan" in the trustees alone, and not the employer. Id. (quoting 29 U.S.C. § 1103(a)).

Numerous courts have recognized that an ERISA plan constitutes a legally autonomous entity which is separate from the employer who sponsors the plan. See Reich v. Valley Nat'l Bank of Ariz., 837 F.Supp. 1259, 1286 (S.D.N.Y.1993); see also Hubbert v. Prudential Ins. Co. of Am., 105 F.3d 669, 1997 WL 8854, at *3 (10th Cir. Jan.10, 1997) (employer and plan are separate entities and release of one does not operate to release other); Antoniou v. Thiokol Corp. Group Long Term Disability Plan (Plan No. 503), 849 F.Supp. 1531, 1534 (M.D.Fla.1994) (same). Because Wal–Mart is an entity distinct from the Plan under ERISA, it qualifies as a "third party" as that phrase is used in the cooperation clause of the SPD.

17. In the alternative, Willard argues that the subrogation clause is ambiguous because it is not clear whether—to be subject to subrogation—a payment must be made by a "third party" or "another party." For reasons stated above, the Court finds no ambiguity in the subrogation provision. Even if the Court found that the subrogation provision was ambiguous, Wal–Mart qualifies as a "third party" or "another party" for the reasons outlined above.

ERISA defines "parties in interest" to ensure that the Plan does not engage in certain transactions (such as loans) with interested parties. Such statutory rules emphasize that under ERISA, the Plan and the employer sponsor are separate entities and both entities must abide by certain restrictions before one can engage in a transaction with the other. The very fact that Wal–Mart is a "party in interest" which must abide by certain rules of separation from the Plan supports the Court's conclusion that Wal–Mart is a legal entity distinct from the Plan.[18]

For the above reasons, the Court finds that Willard must reimburse the Plan for medical expenses which it paid on his behalf. The Plan's right of reimbursement, however, is subject to certain defenses which the Court will discuss below.

## III. Equitable Defenses

### A. Unclean Hands

■ Based on the close relationship between the Plan and Wal–Mart, the tortfeasor, Willard argues that the Plan cannot assert equitable relief because it has unclean hands. The clean hands doctrine provides in substance that "no person can obtain affirmative relief in equity with respect to a transaction in which the person has been guilty of inequitable conduct." *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 720, 924 P.2d 1239, 1250 (1996). "The application of the clean hands doctrine is subject to certain limitations. Conduct which will render a party's hands unclean so as to deny him access to a court of

equity must be willful conduct which is fraudulent, illegal or unconscionable. Furthermore the objectionable misconduct must bear an immediate relation to the subject-matter of the suit and in some measure affect the equitable relations subsisting between the parties to the litigation and arising out of the transaction." *Green v. Higgins*, 217 Kan. 217, 220–21, 535 P.2d 446 (1975) (citation omitted). The doctrine is not a binding rule, but the Court may apply the doctrine in its discretion. *See T.S.I. Holdings*, 260 Kan. at 720, 924 P.2d at 1250.

■ Willard argues that because the Plan and Wal–Mart are essentially one entity, the Plan cannot seek equitable relief. As explained above, however, the Plan and Wal–Mart are distinct legal entities. Willard does not claim that the Plan was involved in the underlying tort or that it has engaged in fraudulent, illegal or unconscionable conduct. Willard's tort claim has been resolved in a separate action and Wal–Mart, the alleged tortfeasor, is no longer a party to this case. The objectionable conduct therefore does not affect the equitable relations of the parties to the present litigation. *See Green*, 217 Kan. at 221, 535 P.2d at 449–50. Also, Willard has not shown that his defense of unclean hands bears "an immediate relation to the subject-matter" of this suit. *Id.*

For these reasons, the Court finds in plaintiff's favor on defendant's affirmative defense of unclean hands.

---

18. Under Willard's interpretation, the terms "third party" and "another party" would exclude everyone defined as a "party in interest" to the Plan. Such an interpretation would preclude the Plan from recovering medical expenses paid by one million covered participants in the Plan, who are all potential tortfeasors, 29 U.S.C. § 1002(14)(C), (H), as well as employees of any organization which provides services to the Plan (such as BCBS), 29 U.S.C. § 1002(14)(B), (H). For example, if one employee received payment for injuries negligently inflicted by another employee in a non-work setting, Willard's interpretation would preclude the Plan from seeking reimbursement of medical bills paid on behalf of the injured employee. Such an interpretation would unduly limit the expansive subrogation clause.

**B: *Estoppel***

In the Pretrial Order, Willard asserts that "[b]ecause Plaintiff's sponsor, Wal-Mart Stores, Inc., caused Mr. Willard to accrue the medical bills, it should be estopped from making an equitable subrogation claim." *Pretrial Order* (Doc. # 95) filed October 29, 2003 at 13. In his briefing on the cross motions for summary judgment, Willard did not raise this defense or explain how it might preclude reimbursement in this case. In addition, Willard's estoppel defense is essentially identical to the defense of unclean hands which the Court rejected above. For these reasons, the Court finds in plaintiff's favor on defendant's affirmative defense of estoppel.

## IV. Whether The Plan Is Subject To K.A.R. § 40-1-20

As explained above, the subrogation provision in the SPD provides that Willard reimburse the Plan from his settlement with Wal-Mart. Willard argues that under K.A.R. § 40-1-20, the subrogation and reimbursement provision of the SPD is unenforceable. The Plan argues that ERISA preempts K.A.R. § 40-1-20 and that the subrogation clause in the SPD requires that the Plan be reimbursed.

Kansas law prohibits an insurance company from issuing a policy which contains a subrogation clause "applicable to coverages providing for reimbursement of medical, surgical, hospital or funeral expenses." K.A.R. § 40-1-20. On the other hand, ERISA is silent about subrogation provisions. "ERISA neither requires a welfare plan to contain a subrogation clause nor does it bar such clauses or otherwise regulate their content." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa,* 130 F.3d 950, 958 (10th Cir.1997) (quoting *Ryan v. Fed. Express Corp.,* 78 F.3d 123, 127 (3d. Cir.1996)), *cert. denied,*

523 U.S. 1139, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

ERISA Section 514(a) preempts all state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). ERISA's preemption provision is "deliberately expansive," *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), and has "a broad scope" *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). A state law "relates to" a covered employee benefit plan for purposes of Section 514(a) if it "(1) has a connection with or (2) reference to such a plan." *Id.* at 324, 117 S.Ct. 832.

Despite the breadth of the preemption clause, the "saving clause" exempts from preemption any person or state law that regulates insurance, banking or securities. *See* 29 U.S.C. § 1144(b)(2)(a). The "saving clause," however, is subject to the "deemer clause" which states in part that "neither an employee benefit plan described in section 1003(a) of this title ... nor any trust established under such a plan, shall be deemed to be an insurance company." 29 U.S.C. § 1144(b)(2)(b). "Self-funded employee benefit plans ... may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of... state laws." *FMC Corp. v. Holliday,* 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). On the other hand, employee benefit plans that are insured by insurance companies are bound indirectly by state insurance regulations insofar as they apply to the plans' insurers. *See id.* at 61, 111 S.Ct. 403.

K.A.R. § 40-1-20 regulates insurance, but the parties dispute whether the Plan is deemed an insurance company by virtue of its agreement with BCBS. Willard argues that the Plan is not self-funded because it contracts with BCBS to provide

health insurance benefits.[19] A plan is ordinarily defined as self-funded when "it does not purchase an insurance policy from any insurance company *in order to satisfy its obligations to its participants.*" *Id.* at 54, 111 S.Ct. 403 (emphasis added). Provided that the administrator does not assume any financial risk relating to benefit claims, a plan remains self-funded even if it contracts with an insurance carrier to provide administrative services. *See Ins. Bd. Under Social Ins. Plan of Bethlehem Steel Corp. v. Muir,* 819 F.2d 408, 411–13 (3d Cir.1987); *Birdsong v. Olson,* 708 F.Supp. 792, 800 (W.D.Tex.1989).

■ Under the Utilization Agreement, BCBS does not assume any risk relating to potential claims. The Utilization Agreement provides that "[i]t is understood and agreed by the parties hereto that BCBSK is providing certain administrative services only and is not assuming any financial risk or obligation with respect to payment of claims by virtue of its execution and performance of this agreement." Utilization Agreement ¶ 5.1. Unlike a typical insurer, BCBS is not legally obligated to pay claims. The Plan assumes the risk of an unusually high number of claims and retains the benefits of a low number of claims. The Plan simply has contracted with BCBS to negotiate certain rates with a network of providers. The fact that BCBS also happens to be an insurance company does not transform the nature of its service under the Utilization Agreement.

■ Willard characterizes the agreement between BCBS and the Plan as a "form of stop-loss coverage" which provides a ceiling on what the Plan might otherwise pay. *See Defendant's Memorandum In Support Of Defendant's Motion For Summary Judgment* (Doc. # 73) filed August 30, 2003 at 40. Even if the Court characterized the agreement as stop-loss insurance, however, numerous courts have recognized that a plan does not lose its self-insured or self-funded status by purchasing stop-loss or excess insurance. *See Am. Med. Sec., Inc. v. Bartlett,* 111 F.3d 358 (4th Cir.1997); *Lincoln Mut. Cas. Co. v. Lectron Prod., Inc., Employee Health Benefit Plan,* 970 F.2d 206 (6th Cir.1992); *United Food & Commercial Workers & Employers Ariz. Health & Welfare Trust v. Pacyga,* 801 F.2d 1157 (9th Cir.1986); *Donner v. Lawrence Paper Co., Inc.,* 2002 WL 303548, *6 (D.Kan. Feb.15, 2002); *Drexelbrook Eng'g Co. v. The Travelers Ins. Co.,* 710 F.Supp. 590, 597–98 (E.D.Pa.), *aff'd,* 891 F.2d 280 (3d Cir.1989). The Third Circuit has explained:

> Merely by purchasing stop-loss insurance and at the same time retaining financial responsibility for plan participants' coverage, self-funded plans may not rely on the assets of an insurance company in the event of insolvency. *See id.* It follows that reimbursement and subrogation rights are vital to ensuring the financial stability of self-funded plans. Consistent with other courts of appeals, therefore, we hold that when an ERISA plan purchases stop-loss insurance but does not otherwise delegate its financial responsibilities to another third

19. Apparently, Willard also argues that the Plan is only "partially" self-funded because employees also contribute to the Plan. The Court rejects Willard's contention. First, in his answer, Willard admitted that the Plan is a "self-funded ERISA plan." *See Defendant's Amended Answer To Plaintiff's Amended Complaint* (Doc. # 30) filed April 7, 2003 ¶ 12.

Second, under ERISA, self-funded plans generally refer to plans where the employer and employees contribute to the plan. *See, e.g., Hall v. Wal–Mart Assocs. Group Health Plan Corps.,* 99 F.3d 1145, 1996 WL 477034, at *1 (9th Cir. Aug.21, 1996); *Harvey v. Machigonne Benefits Adm'rs,* 122 F.Supp.2d 179, 186 (D.Me.2000).

party insurer, it remains an uninsured self-funded welfare plan for ERISA preemption purposes. Because stop-loss insurance is designed to protect self-funded employee benefit plans, rather than individual participants, plans purchasing stop-loss insurance are not deemed "insured" under ERISA.

*Bill Gray Enters.*, 248 F.3d at 214.

In addition to the agreement between BCBS and the Plan, Willard notes that the Plan's 2001 IRS tax form 5500 indicates that the Plan provides a portion of its benefits through the purchase of an insurance policy.[20] At oral argument, plaintiff explained that the tax form was completed for all of its contracts throughout the United States, that the Plan does not purchase insurance to provide health insurance benefits in Kansas and that the contract between BCBS and the Plan is for administrative services only. Schedule A to form 5500 lists the insurance carriers which provide health benefits for Plan participants, but BCBS is not listed on that schedule. *See* Exhibit 7A to *Supplemental Index Of Evidence In Support Of Plaintiff's Amended Motion For Summary Judgment And In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 103) filed December 19, 2003. Instead, BCBS appears on Schedule C, which identifies service providers of the Plan. *See* Schedule C, Exhibit 7 to *Index Of Evidence In Opposition To Defendant's Mo-*

*tion For Summary Judgment And In Further Support Of Plaintiff's Motion For Summary Judgment* (Doc. # 86). Since plaintiff supplemented the record with the complete IRS tax form, including Schedule A, Willard has not offered any interpretation of the tax form which suggests that the Plan purchased "insurance" from BCBS. For these reasons, the Court finds that K.A.R. § 40–1–20 does not bar the enforcement of the subrogation and reimbursement provision of the SPD.

## V. Attorney Fees Incurred By Willard In Underlying Tort Action

In the damages section of the pretrial order, Willard asks that the Court decide whether plaintiff's interest in the disputed funds should be reduced for attorney fees which he incurred in the underlying tort action. *See Pretrial Order* (Doc. # 95) at 16. Plaintiff briefed this issue in its initial summary judgment motion, see plaintiff's *Brief In Support Of Amended Motion For Summary Judgment* (Doc. # 77) filed September 2, 2003 at 10–12, but Willard did not present argument on the issue in his opposition brief or at oral argument.[21]

■ The SPD provides that the Plan is entitled to 100 per cent reimbursement of the benefits it paid from any settlement, see SPD at 42, and that it "does not pay for nor is responsible for the covered person's attorney's fees, expenses or costs."

---

**20.** The instructions for tax form 5500 provide: "Insurance" means the plan has an account, contract, or policy with an insurance company, insurance service, or other similar organization (such as Blue Cross, Blue Shield, or a health maintenance organization) during the plan or DFE year. (This includes investments with insurance companies such as guaranteed investment contracts (GICs).) Do not check "insurance" if the sole function of the insurance company was to provide administrative services.

**21.** As explained above, the parties agreed that the Court could treat the memoranda on the

cross motions for summary judgment as proposed findings of fact and conclusions of law and rule as if the arguments and evidence had been submitted at a bench trial. *See supra* note 1. In the only potentially relevant part of his memoranda, Willard responded that both parties had waived any claim to attorneys' fees. *Defendant's Memorandum In Opposition To Plaintiff's Motion For Summary Judgment* (Doc. # 79) at 25. Willard was apparently referring to attorney fees in this action, however, and not the underlying tort action.

*Id.* at 43. Based on the plain language of the Plan and absent any contrary argument by Willard, the Court concludes that plaintiff's equitable lien on the funds in the Court registry should not be reduced for attorney fees which Willard incurred in the underlying tort action. *See Varco,* 338 F.3d at 689–93 (finding that similar reimbursement provision allowed Administrative Committee full reimbursement; federal and state common fund doctrines did not authorize payment of participant's attorney fees from that recovery); *see also Alves v. Silverado Foods, Inc.,* 6 Fed. Appx. 694, 704 (10th Cir.2001) (plan's use of word "priority" in subrogation clause specifically allowed plan right of first reimbursement out of any recovery participant obtained even if participant was not made whole).

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion To Amend Pretrial Order And To Amend Motion For Summary Judgment* (Doc. #105) filed January 5, 2004 be and hereby is **OVERRULED as moot.**

**IT IS FURTHER DECLARED** that plaintiff is entitled to recover from the proceeds of the settlement executed between Wal–Mart Stores, Inc. and defendant on August 27, 2002 the $534,919.68 which it paid for defendant's medical bills. Because those proceeds are in the Court registry, the Court declares that plaintiff has an equitable lien on those funds and orders the Clerk to disperse them to plaintiff.

**IT IS FURTHER DECLARED** that plaintiff's equitable lien on the funds in the Court registry shall not be reduced for attorney fees which defendant incurred in the underlying tort action.